## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------------x
                                       :
In re:                                 :  Chapter 11
                                       :
Velti Inc., et al.,¹                   :  Case No. 13-_____ (_____)
                                       :
                                       :  (Joint Administration Pending)
           Debtors.                    :
                                       :
-------------------------------------------------------------x
```

## DECLARATION OF JEFFREY G. ROSS
## IN SUPPORT OF FIRST DAY PLEADINGS

1.        I am a Director of Velti Inc. ("Velti") and Air2Web, Inc. ("A2W," collectively

with Velti and the other above captioned debtors and debtors in possession, the "Debtors"), and

the Chief Financial Officer of the Debtors' parent corporation, Velti plc ("PLC" and together with

its subsidiaries, the "Company").  While I  only recently became a Director of  Velti and A2W, I

am familiar with their operations by virtue of my position at PLC.  I joined Velti, on January 7,

2013.  Prior to joining the Company, I was Chief Financial Officer, and prior to that Chief

Accounting Officer and Corporate Controller of Sybase, Inc., a leading enterprise software

company.  Prior to joining Sybase, I was employed in the international tax services group at Price

Waterhouse from 1987 to 1997.   I have a B.S. in Business Administration from the University of

California – Berkeley.

---

[1]        The Debtors are the following six entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Velti Inc. (4475), Air2Web, Inc. (5572), Air2Web Interactive, Inc. (2364), Velti North America, Inc. (8900), Velti North America Holdings, Inc. (3953) and Velti US Holdings, Inc. (8299).  The mailing address of each of the Debtors, solely for purposes of notices and communications, is Spear Tower, 1 Market Street Suite 1400, San Francisco, California 94105.

2.      On the date hereof (the "Petition Date"), the Debtors filed with this Court voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), as well as certain motions and other pleadings (the "First Day Pleadings").  I am authorized by the Debtors to submit this Declaration on their behalf in support of the First Day Pleadings.

3.      The First Day Pleadings are intended to enable the Debtors to operate effectively and efficiently during these chapter 11 cases, as well as avoid certain adverse consequences that might otherwise result from the commencement of such cases.  Among other things, the First Day Pleadings seek relief aimed at maintaining the confidence of the Debtors' various stakeholders, vendors and employees to preserve value that would otherwise quickly erode.  Gaining and retaining the support of these key constituencies is critical to the Debtors' efforts to stabilize their business operations and maximize value for the benefit of their creditors.   I have reviewed the First Day Pleadings, and it is my belief that the relief sought therein is necessary to:  (a) avoid immediate and irreparable harm to, and ensure the uninterrupted operation of, the Debtors' business; and (b) maximize and preserve the value of the Debtors' chapter 11 estates.

4.      In my capacity as Chief Financial Officer of PLC and a Director of Velti and A2W, I am familiar with the Debtors' day-to-day operations, financial condition, business affairs and books and records.  Except as otherwise indicated, all facts set forth in this Declaration are based upon (a) my personal knowledge, (b) my review of relevant documents, (c) information supplied to me by other members of the Debtors' management team or professionals retained by the Debtors, or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If called upon, I could and would testify competently to the facts set forth herein.

WEST\244793498. 2

5.      Part I of this Declaration provides an overview of the Debtors' business.  Part II provides a description of the Debtors' current debt obligations.  Part III provides a discussion of the events that compelled the commencement of these chapter 11 cases, as well as the Debtors' plan for these cases.  Part IV affirms and incorporates the facts that support the relief requested in the First Day Pleadings.

**Part I
Overview of the Debtors' Business**

History and General Background

6.      PLC, which is incorporated under the laws of Jersey, Channel Islands and traded on the NASDAQ, and its related and affiliated companies throughout the world are a leading global provider of mobile marketing and advertising technology that enables brands, advertising agencies, mobile operators and media companies to implement highly targeted, interactive and measurable campaigns by communicating with and engaging consumers via their mobile devices. The Company's platform allows customers to use mobile media, together with traditional media, such as television, print, radio and outdoor advertising, to reach targeted consumers, engage consumers through the mobile internet and applications, convert consumers into their customers and continue to actively manage these relationships through the mobile channel.

7.      The Company currently operates through three separate divisions, Mobile Marketing, Performance Marketing and Advertising.  The Mobile Marketing Business Unit ("MMBU ") consists largely of the Company's acquisitions of A2W and Mobile Interactive Group, Ltd. ("MIG"), a company formed under the laws of England and Wales.  As described below, A2W is a core operating platform within the MMBU.   In addition, A2W, a Delaware corporation, relies heavily upon its affiliated company, Velti,  a Delaware corporation, for accounting, human relations and other services.  Certain other critical assets of the MMBU are

3

also housed within Velti.   An organization chart of the relevant entities is attached hereto as

Exhibit A.

8.      The MMBU offers a business-to-business service that assists enterprises in

optimally engaging their end user customers utilizing MMBU's technology through the mobile

channel.  The MMBU's integrated mobile marketing solutions allow enterprises to reach new

audiences with interactive strategies, build mobile communities, acquire new customers and

provide mobile-based CRM services.  Its platform allows marketers to execute highly

personalized, enterprise-scale mobile engagement programs, including customer acquisition,

cross-channel messaging promotions, mobile site and application development, ongoing

customer relationship management and cross-platform campaign data visualization.

9.      A2W was founded in 1999 and funded with a cumulative total of approximately

$85 million by Vantage Point Capital Partners and Softbank before it was acquired by PLC in

September 2011.  A2W offers companies the tools and technology to promote products and

brands, improve the efficiency of customer service and enable mobile transactions, anytime,

anywhere.  Over the past 10 years, Air2Web has launched thousands of mobile marketing

campaigns and integrated mobile technology into strategic business applications for customer

care.  Founded in 2004, and acquired by PLC in November 2011, MIG comprises a unique

combination of services including mobile billing, messaging and mCommerce; multi-channel

creative solutions; the design, build and publishing of mobile internet sites and applications, and

user experience design.  Among the significant customers of the MMBU are Argos, Vodafone,

ITV, Panasonic, Pepsico, Dish TV and AT&T Mobility.

10.      Velti's principal executive offices are located in San Francisco, California, and

A2W's principal offices are located in Atlanta, Georgia.  A2W does own 99% of an Indian

subsidiary, Velti India Private, Ltd, which is engaged in the MMBU business within India and provides critical services to other members of the MMBU family of companies. In addition, certain other assets of the MMBU are held at PLC and at the Company's subsidiaries in the United Kingdom, British Virgin Islands and the Netherlands.

## Part II
## Debtors' Obligations

11.     PLC, Velti and certain affiliates are parties to a Credit Agreement dated as of August 10, 2012, with HSBC Bank USA, National Association ("HSBC"), as Administrative Agent (the "Credit Agreement"). While A2W is not a borrower under the Credit Agreement, it is a guarantor pursuant to the Guarantee and Collateral Agreement dated as of August 10, 2012. As of the Petition Date, the amount outstanding under the Credit Agreement is approximately $57.5 million, exclusive of outstanding interest.[2]

12.     The Company had been in default under the Credit Agreement for almost a year prior to the Petition Date, and had attempted to work with HSBC regarding additional financing to allow the Company to restructure its operations or bridge toward a strategic transaction. As HSBC was no longer willing to provide any additional financing to the Company and had demanded payment in full of all amounts outstanding under the Credit Agreement, the Company and its advisors worked to provide an alternative path forward through the purchase of the

---

[2]     The borrowers under the Credit Agreement are Velti, PLC, MIG and Velti Mobile Platforms, Limited, a company formed under the laws of the British Virgin Islands. The guarantors under the Credit Agreement are Velti Mobile Value Added Services Limited, a company formed under the laws of the British Virgin Islands, Velti DR Limited and Velti Limited, both companies incorporated under the laws of England and Wales, Velti Software Products and Related Products and Services S.A., a company formed under the laws of Greece, Velti Platforms and Services Limited, a company formed under the laws of Cyprus, Mobile Interactive Group Holdings Netherlands B.V. and Mobile Interactive Group Netherlands B.V., both companies formed under the laws of the Netherlands, Mobclix, Inc. and Velti U.S. Holdings, Inc., both companies formed under the law of Delaware and A2W.

outstanding debt under the Credit Agreement to a party not only willing to provide the Company

with additional breathing room and liquidity, but one that shared a view on the untapped

opportunities provided by the Company's business, and in particular the MMBU.  Accordingly, on

November 1, 2013, the debt outstanding under the Credit Agreement was purchased by GSO

Credit–A Partners LP, GSO Palmetto Opportunistic Investment Partners LP and GSO Coastline

Partners LP (together, "GSO"), which are owned by GSO Capital Partners, the credit division of

Blackstone.  The Debtors also have a significant amount of unsecured debt.  As of the Petition

Date, the Debtors estimate they have outstanding unsecured obligations of $6.2 million. Excluding

intercompany payables, it is contemplated that the vast majority of all obligations owed to

suppliers and contract counterparties relating to the MMBU business will be assumed by the

purchaser of the MMBU assets.

**Part III**
**Events Leading to the Commencement of**
**These Cases and the Debtors' Chapter 11 Plans and Strategies**

13.    Like many technology-based industries, the mobile advertising business in which

the Company focuses its operations have been undergoing rapid changes, many of which have

made it difficult for the Debtors to operate profitably.  First, the Company attempted to rapidly

expand both organically and inorganically within the US and globally, creating a cost structure

that proved to be unsustainable. Prior to its U.S. acquisitions beginning in 2009, and its UK

acquisition in 2011, much of the Company's business was located within Greece and Eastern

Europe, with expansion into the Middle East and Africa.  It was anticipated that this business

would support the Company's growth initiatives, but the rapid and continued deterioration of the

Greek economy created severe liquidity problems with the group.  Not only has the cost structure

to operate the business required the Debtors to defer paying certain creditors over an extended

period of time, but additional business developments initiatives of the Debtors further eroded the

6

already limited liquidity.  Finally, while the MMBU has demonstrated substantial stability in a difficult marketing environment, the continued erosion of the Company's other operating businesses, which had resulted in substantial write-downs, has led to increasing customer uncertainty, and the anticipated competitor reaction.

14.     As a result of the above items, the Company has experienced continued operating losses which have resulted in declining cash over the past year.  The combination of lower margins and sale volumes, high employee costs and the inability to obtain additional liquidity when confronted with mounting losses during the second and third quarters of 2013 has significantly affected the Company's liquidity and ability to pay its debts as they become due.

15.     Prior to filing these chapter 11 cases, the Company engaged Jefferies & Company ("Jefferies") to explore a broad range strategic financing and sale options for the Company and its various business units.  Initially, Jefferies focused its marketing efforts on the sale of the Company's advertising business, which resided principally at Mobclix, Inc.  ("Mobclix").   While Jefferies was marketing the Mobclix assets, it simultaneously worked with the Company regarding a number of other strategic options, including a broader sale of the all, or substantially all of the Company's assets.  This broader sale process began in September 2013, and sought potential buyers for the Company "as a whole" or alternatively for the Company's business units. It became clear through this process that, owing to the value of the MMBU business and its growth potential, and the jurisdictions where it operated, the sale of the MMBU business was the likely initial path the Company would have to proceed upon.

16.     Simultaneously, due to the mounting pressures from HSBC and increasing liquidity constraints, it became clear that an alternative path was for the sale of the debt under the Credit Agreement in conjunction with a broader sale process.  Again, Jefferies moved quickly

7

toward exploring this alternative with a range of potential strategic and financial buyers.   In the end, Jefferies' marketing efforts regarding the sale of the Company and its business units, as well as its debt involved  contacting over 65 potential purchasers.  From this group, 30 purchasers executed confidentiality agreements and conducted considerable due diligence.  Thereafter, six separate parties submitted offers of interest to acquire the MMBU.  After careful evaluation and further negotiation, it was determined that the structure and financial support provided  by GSO, as well as its ability to consummate a transaction within the limited time available, presented the best option for the Debtors and the MMBU business, as well as the Company.   The Debtors believe that the MMBU assets have been thoroughly marketed by Jefferies and that an expedited sale of their business is essential to not only preserving the underlying value of their operations by providing customers and employees with a clear path forward, but in satisfying the obligations to their creditors.

**Part IV**
**Facts Relevant to the First Day Pleadings**

17.     Concurrently with the filing of these chapter 11 cases, the Debtors filed the First Day Pleadings, which request various forms of relief.  Generally, the First Day Pleadings have been designed to meet the Debtors' goals of:  (a) continuing their operations in chapter 11 with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of their employees, vendors, suppliers and service providers during the Debtors' reorganization process; (c) establishing procedures for the smooth and efficient administration of these chapter 11 cases; (d) obtaining debtor-in-possession financing and (e) working toward a prompt sale of their assets.

18.     I have reviewed and discussed with Debtors' counsel each of the First Day Pleadings filed contemporaneously herewith (including the exhibits thereto and supporting

8

memoranda) and incorporate by reference the factual statements set forth in the First Day

Pleadings.  It is my belief that the relief sought in each of the First Day Pleadings is tailored to

meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve a

successful going-concern sale of their assets.

19.    It is my further belief that, with respect to those First Day Pleadings requesting

the approval of debtor-in-possession financing from GSO (the "DIP Motion"),  the relief

requested in essential for the Debtors' to sustain their operations and similarly for the other

entities in the United Kingdom to obtain the liquidity necessary to continue their operations.  As

noted above, the Debtors and  non-debtor affiliates have been unable to obtain additional

liquidity from HSBC for many months, and as a result, their liquidity position is dangerously

low.  In fact, as of the Petition Date, the Debtors in the aggregate have less than $100,000 in

available cash.  Absent the ability to obtain additional liquidity through the financing

contemplated in the DIP Motion, it is unlikely that the Debtors and other MMBU entities would

have the liquidity to operate, thus likely leading to a liquidation of these businesses.  Owing to

the highly leveraged nature of the Company's business operations, it would have been virtually

impossible to find a party willing to provide incremental financing other than GSO.

20.    With respect to Debtors' request for approval of bid procedures relating to the

sale of the Debtors' assets (the "Bid Procedures Motion"), the approval of this motion as quickly

as practicable is essential for the continued viability of the MMBU.  As noted above, Jefferies

has engaged in a fulsome marketing process for the both the MMBU and the Debtors' remaining

assets.  As a result of these efforts, GSO provided the highest and otherwise best proposal to

purchase the Debtors' assets.  Nonetheless, Jefferies has continued to market these assets to

determine if an alternative buyer is willing to purchase these assets.  The entry of the Bid

9

Procedures Order will provide far greater certainty to our customers, vendors and employees regarding the future of the MMBU.

21.    Finally, in regard to authority to pay discrete prepetition claims or continue selected prepetition programs (e.g., those First Day Pleadings seeking relief related to the Debtors' obligations to their employees), the relief requested is essential to the Debtors' reorganization and necessary to avoid immediate and irreparable harm to the Debtors' employees.  Impairment of the Debtors' business operations, or of their relationships with their employees or the Debtors' other vendors — at the very time when the smooth operation of those operations and the dedication, confidence and cooperation of those constituencies is most critical — would clearly imperil the Debtors' chance to preserve the underlying value of their business and provide a recovery to their creditors.  The Debtors operate in an extremely competitive industry and any diminution in the Debtors' ability to maintain their operations in the ordinary course will have an immediate and irreparable harmful impact upon the value of the Debtors' estates to the detriment of all of the Debtors' creditor constituencies.  The Debtors believe that payment of those selected prepetition claims identified in the First Day Pleadings will forestall irreparable harm and that all creditors of the Debtors will ultimately benefit from the relief requested therein.

Dated:  November 4, 2013
      San Francisco, California

                                                 Jeffrey G. Ross

WEST\244793498. 2