## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x
                      :

In re:                        :   Chapter 11
                         :

Velti Inc., *et al.*,[1]         :   Case No. 13-_____ (____)
                         :
                         :   (Joint Administration Pending)
          Debtors.       :
                         :

-------------------------------------------------------------x

## MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) AND 507 AND BANKRUPTCY RULES 2002, 4001 AND 9014 (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL AND (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

hereby submit this motion (the "Motion") to the United States Bankruptcy Court for the District

of Delaware (the "Court"), pursuant to sections 105(a), 361, 362, 363, 364 and 507 of title 11 of

the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001,

6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of interim and final

orders:  (a) authorizing the Debtors to obtain financing (the "DIP Financing") pursuant to the

*$25,000,000 Debtor-In-Possession Loan Agreement*, substantially in the form attached hereto as

---

[1]     The Debtors are the following six entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Velti Inc. (4475), Air2Web, Inc. (5572), Air2Web Interactive, Inc. (2364) (together with Velti Inc. and Air2Web, Inc., the "MMBU Debtors"), Velti North America, Inc. (8900), Velti North America Holdings, Inc. (3953) and Velti US Holdings, Inc. (8299).  The mailing address of each of the Debtors, solely for purposes of notices and communications, is Spear Tower, 1 Market Street Suite 1400, San Francisco, California 94105.

Exhibit B (as may be amended, the "DIP Agreement");[2] (b) authorizing the Debtors to utilize Cash Collateral (defined below); (c) granting liens and providing superpriority administrative expense status to the DIP Lenders (defined below); (d) granting adequate protection to the Prepetition Lenders (defined below); (e) modifying the automatic stay; (f) scheduling a final hearing; and (g) granting related relief.  In support of this Motion, the Debtors incorporate the statements contained in the *Declaration of Jeffrey Ross in Support of First Day Pleadings* (the "Ross Declaration") filed contemporaneously herewith and further respectfully state as follows:

## Jurisdiction and Venue

1.    The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

## Background

**Company Background**

2.    On November 4, 2013 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3.    The Debtors are direct and indirect subsidiaries of Velti plc ("PLC" and together with its affiliates, the "Company"), which is incorporated under the laws of Jersey, Channel Islands and traded on the NASDAQ.  The Company is a leading global provider of mobile marketing and advertising technology that enables brands, advertising agencies, mobile operators and media companies to implement highly targeted, interactive and measurable campaigns by communicating with and engaging consumers via their mobile devices.

---

[2]    Capitalized terms used in this Motion but not defined herein shall have the meanings ascribed to such terms in the DIP Agreement.

4.     The Company currently operates through three separate divisions, Mobile Marketing, Performance Marketing and Advertising.  The Mobile Marketing Business Unit ("MMBU ") offers a business-to-business service that assists enterprises in optimally engaging their end user customers utilizing MMBU's technology through the mobile channel.  The MMBU's integrated mobile marketing solutions allow enterprises to reach new audiences with interactive strategies, build mobile communities, acquire new customers and provide mobile-based CRM services.

5.     The MMBU consists largely of the Company's acquisitions of debtor Air2Web, Inc. ("A2W") and Mobile Interactive Group, Ltd. ("MIG"), a company formed under the laws of England and Wales.   In addition, A2W relies heavily upon its affiliated company, Velti Inc. ("Velti"), for accounting, human resources and other services.  Certain other critical assets of the MMBU are also housed within Velti.  Velti's  principal executive offices are located in San Francisco, California, and A2W's principal offices are located in Atlanta, Georgia.  A2W also owns 99% of an Indian subsidiary, Velti India Private, Ltd, which is engaged in the MMBU business within India and provides critical services to other members of the MMBU family of companies.  In addition, certain other assets of the MMBU are held at PLC and at the Company's subsidiaries in the United Kingdom, British Virgin Islands and the Netherlands.

6.     Velti, A2W and certain affiliates are parties or guarantors to a Credit Agreement dated as of August 10, 2012 (the "Prepetition Credit Agreement") with HSBC Bank USA, National Association, as Administrative Agent ("HSBC") and the lender parties thereto from time to time (the "Prepetition Lenders").  As of the Petition Date, the amount outstanding under the Prepetition Credit Agreement was approximately $57.5 million, exclusive of outstanding interest.  The Company had been in default under the Prepetition Credit Agreement for nearly a

year, and during that time had attempted to work with its lenders under the Prepetition Credit

Agreement regarding additional financing to allow the Company to restructure its operations or

bridge toward a strategic transaction. With these efforts proving unsuccessful and the Debtors'

liquidity situation deteriorating rapidly, the Company and its advisors began to immediately

explore a range of strategic alternatives. These results led to a series of transactions that began

on November 1, 2013, when the debt outstanding under the Prepetition Credit Agreement was

purchased by GSO Credit–A Partners LP, GSO Palmetto Opportunistic Investment Partners LP

and GSO Coastline Partners LP (together, "GSO"), which are owned by GSO Capital Partners,

the credit division of Blackstone.

7.      With the sale of the debt under the Prepetition Credit Agreement having been

completed, GSO has agreed to provide debtor-in-possession financing that is critical for Debtors

to continue to operate their businesses, and begin to remedy the damage to the business caused

by their dearth of liquidity. Finally, an entity controlled by GSO and the MMBU Debtors have

reached an agreement under which such entity has agreed to purchase the MMBU, including the

those related assets owned by the MMBU Debtors, subject to a competitive bidding process.

With the Debtors having suffered through considerable operating and financial stresses during

the past year, an expedited sale of their business is essential to not only preserving the underlying

value of their operations by providing customers and employees with a clear path forward, but in

satisfying the obligations to their creditors.

**Debtors' Prepetition Financing**

8.      As of the Petition Date, the Loan Parties (as defined in the Prepetition Credit

Agreement, the "Loan Parties") were indebted to the Prepetition Lenders (and together with the

Prepetition Agent, the "Prepetition Secured Parties"), without defense, counterclaim or offset of

any kind, in the aggregate principal amount of not less than $56.35 million in respect of loans

and other extensions of credit made pursuant to the Prepetition Documents, plus accrued and unpaid interest thereon and all fees accrued thereunder and all other fees and expenses (including fees and expenses of attorneys and advisors) as provided in the Prepetition Documents (collectively with the other obligations under the Prepetition Documents, the "Prepetition Obligations").

9.      To secure the Prepetition Obligations, the Loan Parties granted security interests and liens (the "Prepetition Liens") to the Prepetition Lenders and the Prepetition Agent (for the benefit of the Prepetition Lenders and the other secured parties referenced in the Prepetition Documents), including liens on and security interests in the personal and real property of such Loan Parties constituting "Collateral" under, and as defined in, the Prepetition Credit Agreement (together with the Cash Collateral, the "Prepetition Collateral").

10.     As of the Petition Date, the Debtors believe that (i) the Prepetition Liens are valid, binding, perfected, enforceable first priority (subject to permitted exceptions under the Prepetition Credit Agreement) and are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (ii) the Prepetition Obligations constitute legal, valid and binding obligations, enforceable in accordance with the terms of the Prepetition Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), no offsets, defenses or counterclaims to any of the Prepetition Obligations exist, and no portion of the Prepetition Obligations are subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (iii) the Prepetition Obligations constitute allowable secured claims.

11.     The Prepetition Secured Parties have a security interest in the Cash Collateral (defined below), including all amounts on deposit in the Debtors' banking, checking, or other

deposit accounts and all proceeds of Prepetition Collateral realized prepetition or postpetition, to secure the Prepetition Obligations and, respectively, to the same extent and order of priority as that which was held by such party prepetition.

## **Relief Requested**

12.     By this Motion, the Debtors seek, among other things:

(a)     authorization for (a) the Debtors to obtain up to the principal amount of $25,000,000 of postpetition financing, plus fees to be paid in kind ("PIK Fees"),[3] consisting of (i) term loans in the aggregate principal amount of at least $10,000,000 of new money (the "DIP Term Loan"), and (ii) subject to entry of the Final Order (as defined below), $15,000,000 of aggregate principal amount of loans outstanding under the Prepetition Credit Agreement (as defined below), which shall have the liens and priorities set forth herein (such loans, the "Priority Loans"; together with the DIP Term Loan and the additional loans deemed made in payment of the PIK Fees, the "DIP Loans" and the lenders with respect thereto, the "DIP Lenders"), on the terms and conditions set forth in an interim order (the "Interim Order"), a copy of which is attached hereto as Exhibit A, and the DIP Documents, among Velti, Inc. and Air2Web, Inc. (collectively, the "Debtor Borrowers"), Velti Limited, Velti DR Limited, and Mobile Interactive Group Limited, each a private limited company organized under the laws of England and Wales (together with Velti Limited and Velti DR Limited, the "Non-Debtor Borrowers" and, together with the Debtor Borrowers, the "Borrowers"), and each of the Borrowers' affiliates that is a Debtor (other than the Borrowers) as guarantors (the "Guarantors"; and together with the Borrowers, the "DIP Loan Parties"), and Velti plc, a company formed under the laws of the Bailiwick of Jersey, Channel Islands ("Parent") for the limited purposes set forth therein and U.S. Bank, National Association, as administrative agent (in such capacity, the "DIP Agent");

(b)     authorization for the Debtors to execute and deliver the DIP Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(c)     authorization for the Debtors to (a) use the Cash Collateral (as defined below) pursuant to Section 363 of the Bankruptcy Code, and all other Prepetition Collateral, and (b) provide adequate protection to the Prepetition Lenders under the Prepetition Documents, by and among Velti Inc., Velti plc, Mobile Interactive Group Limited and Velti Mobile Platforms Limited, as borrowers, the lenders

---

[3]     Fees in the aggregate amount of $1,250,000 shall be paid in kind and added to the outstanding principal of the DIP Loans, which shall be deemed as additional loans as provided in the DIP Agreement, for an aggregate facility of $26,250,000.

from time to time parties thereto and the Prepetition Agent;

(d)     authorization for the DIP Agent and the DIP Lenders to exercise remedies under the DIP Documents upon the occurrence and during the continuance of an Event of Default;

(e)     subject to entry of the Final Order, authorization to grant liens to the DIP Lenders and the Prepetition Lenders on the proceeds of the Debtors' claims and causes of action (but not on the actual claims and causes of action) arising under Sections 544, 545, 547, 548 and 550 of the Bankruptcy Code (collectively, the "Avoidance Actions");

(f)     subject to entry of the Final Order, the waiver by the Debtors of any right to seek to surcharge against the DIP Collateral (as defined below) or the Prepetition Collateral pursuant to Section 506(c) of the Bankruptcy Code;

(g)     at an interim hearing (the "Interim Hearing") on this motion, pursuant to Bankruptcy Rule 4001, and entry of an Interim Order (a) authorizing the Debtor Borrowers to borrow and be jointly and severally obligated under the DIP Agreement in an aggregate principal amount not to exceed $[___] plus any fees and expenses of the advisors to the DIP Agent and the DIP Lenders prior to the entry of the Final Order, (b) authorizing the Debtor Borrowers to be jointly and severally obligated for the principal amount not to exceed $[___] to be borrowed by the Non-Debtor Borrowers prior to the entry of the Final Order,[4] (c) authorizing the Debtor Borrowers to pay the PIK Fees by adding the entire amount thereof as DIP Loans, (d) authorizing the Guarantors to unconditionally guaranty all of the obligations outstanding under the DIP Agreement, (e) authorizing the Debtors to use the Cash Collateral and the other Prepetition Collateral, and (f) granting adequate protection to the Prepetition Lenders; and

(h)     to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") for this Court to consider entry of a final order in form and substance reasonably satisfactory to the DIP Agent and the Lead Lender (the "Final Order") authorizing and approving on a final basis the relief requested in the Motion, including without limitation, for the Debtor Borrowers on a final basis to utilize and be jointly and severally obligated for all amounts under the DIP Documents, including without limitation, with respect to the Priority Loans and the PIK Fees, and for the Debtors to continue to use the Cash Collateral and the other Prepetition Collateral subject to the terms of the DIP Documents and the Final Order.

## DIP Financing and Cash Collateral

13.     As mentioned above, the Debtors' Prepetition Obligations are secured by first

---

[4]     The Non-Debtor Borrowers are jointly and severally obligated on all DIP Term Loans borrowed by the Debtors Borrowers and with respect to the PIK Fees.

priority liens and security interests in substantially all of the Loan Parties' assets. Those assets constituting the prepetition collateral, and the proceeds thereof now owned or hereafter acquired by the Debtors constitute the Prepetition Collateral. Substantially all of the Debtors' cash, including without limitation, all cash and other amounts on deposit or maintained by the Debtors in any bank accounts, as well as any cash proceeds derived from the disposition of any Prepetition Collateral, constitute proceeds of the Prepetition Collateral and, therefore, are cash collateral of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

14.    The Debtors intend to finance their business operations through the continued use of Cash Collateral and additional financing by obtaining credit and incurring debt, pursuant to Sections 363, 364(c) and 364(d) of the Bankruptcy Code, up to the principal amount of $25,000,000 of postpetition financing, plus fees to be paid in kind, consisting of (i) the DIP Term Loan, and (ii) subject to entry of the Final Order, $15,000,000 of aggregate principal amount of loans outstanding under the Prepetition Credit Agreement. The DIP Loans shall be secured by first priority, valid, priming, perfected and enforceable liens (as defined in section 101(37) of the Bankruptcy Code on property of the Debtors' estates pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and with priority, as to administrative expenses, as provided in section 364(c)(1) of the Bankruptcy Code, subject to the terms and conditions contained herein.

15.    The Debtors believe that this arrangement will meet the Debtors' financing needs during these Chapter 11 Cases. Specifically, the DIP Financing will provide the Debtors with much needed liquidity, in order to permit, among other things, the orderly continuation of the

operation of the business, as well as the implementation and consummation of the sale of

substantially all of the Debtors' assets.

**Concise Statement and Highlighted Provisions**

16.    Consistent with Bankruptcy Rule 4001(c)(1) and Local Rule 4001-2, the

following is a concise statement and summary of the proposed material terms for the Debtors'

request for the use of Cash Collateral and the DIP Financing:[5]  As discussed herein, the Debtors

believe these provisions are reasonable in light of the facts and circumstances of these Chapter

11 Cases and should be approved.

**Concise Statement**

**DIP Agent:**  U.S. Bank, National Association, as administrative agent.

**DIP Lenders:**  Each lender from time to time party to the DIP Agreement, including, but not limited to GSO Credit-A Partners LP, GSO Palmetto Opportunistic Investment Partners LP and GSO Coastline Partners LP.

**DIP Secured Parties:** The DIP Agent, each lender from time to time party to the DIP Agreement, including, but not limited to GSO Credit-A Partners LP, GSO Palmetto Opportunistic Investment Partners LP and GSO Coastline Partners LP, the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document and the successors and assigns of each of the foregoing (collectively, the "DIP Secured Parties").

**Debtor Borrowers:** Velti, Inc. and Air2Web, Inc.

**Non-Debtor Borrowers:** Velti Limited, Velti DR Limited and Mobile Interactive Group Limited.

**Guarantors:**  Each of the Borrowers' affiliates that is a Debtor.

**DIP Loans:**  A loan facility in the aggregate principal amount of $26.25 million consisting of (i) term loans in the aggregate principal amount of at least $10.0 million of new money, (ii) $15.0 million of aggregate principal amount of loans outstanding under the Prepetition Credit Agreement which shall, subject to the DIP Orders, have the liens and priorities in respect of the Loan Parties as set forth below, and (iii) fees in the aggregate amount of $1,250,000 to be paid in kind and added to the outstanding principal of the DIP Loans. ***DIP Agreement Section 2.01***.

---

[5]    The complete statement of the terms of the use of Cash Collateral and DIP Financing is set forth in the DIP Agreement and this summary is qualified by reference to the DIP Agreement.

Each Lender's Commitment shall be reduced by the amount of DIP Term Loans made by such Lender. Each of the Borrowers shall be jointly and severally liable for the DIP Term Loans, and the DIP Term Loans shall be guaranteed, on a joint and several basis, by the Guarantors. *DIP Agreement Section 2.01(a).*

Upon entry of the Final Order, $15.0 million of loans under the Prepetition Credit Agreement shall have the liens and priorities set forth in <u>Section 2.15</u> of the DIP Agreement (such loans, the "<u>Priority Loans</u>") and shall be allocated to each Lender on the Final Order Entry Date in the same proportion as held by such Lender under the Prepetition Credit Agreement as set forth on <u>Schedule 2.01</u> to the DIP Agreement. The Priority Loans shall be the joint and several obligations of the Debtor Borrowers as set forth in <u>Section 2.12</u> of the DIP Agreement and shall be guaranteed, on a joint and several basis, by the Guarantors. *DIP Agreement Section 2.01(c).*

**Maturity Date:** The DIP Facility shall mature and shall be paid in full in cash or otherwise satisfied in full in a manner reasonably satisfactory to the Lead Lender on the date (the "<u>Maturity Date</u>") that is the earliest to occur of (i) 30 days after entry of the Interim Order if the Final Order has not been entered on or prior to such date, (ii) December 31, 2013 (the "<u>Stated Maturity Date</u>") provided that, subject to the satisfaction of certain requirements, the Borrowers may elect once to extend such date by an additional 30 days to January 30, 2014; (iii) the effective date (the "<u>Effective Date</u>") of a chapter 11 plan, in form and substance reasonably satisfactory to the Lead Lender (the "<u>Chapter 11 Plan</u>"), (iv) the closing date of the MMBU Sale, and (v) the acceleration of the DIP Loans. *DIP Agreement Section 1.01.*

**Use of Proceeds:** The Borrowers shall (i) make disbursements and (ii) use the proceeds of the Borrowings for working capital purposes of the Borrowers, in each case solely for such purposes, in such amounts and during such periods as are set forth in the Budget; <u>provided</u>, <u>however</u>, that in no event shall the proceeds of the Borrowers be used (x) to challenge the Liens securing the Obligations or the Prepetition Obligations or to assert any claim or causes of action against the Administrative Agent, the Lenders, the Prepetition Agent or the Prepetition Lenders, or (y) to fund Mobclix except as specifically permitted in a separate line item in the Budget. *DIP Agreement Section 6.12*; *Interim Order ¶ 6.*

**DIP Budget:** "Budget" means (i) a monthly budget through the Stated Maturity Date of the DIP Facility, which for purposes of such budget only shall be January 30, 2014, and (ii) an initial thirteen-week cash flow forecast delivered pursuant to Section 4.01 of the DIP Agreement and as updated pursuant to Section 6.02 of the DIP Agreement, each such budget and forecast in form and substance satisfactory to the Lead Lender. *DIP Agreement Section 1.01.*

The Debtors' use of Cash Collateral shall be consistent with the types of expenses set forth in the Budget and subject to the requirements set forth in the DIP Documents. No payment shall be made to any professional retained pursuant to the Bankruptcy Code (each, a "<u>Professional</u>") to the extent that it would cause the aggregate amount paid to such Professional to exceed the aggregate amount of fees and expenses set forth in the Budget with respect to such Professional through the end of the applicable period for which payment is being requested (the "<u>Budgeted Fees and Expenses</u>"), it being understood that amounts unpaid as a result of the preceding limitation may be accrued and, subject to an order of the Court, paid in any subsequent period(s) to the extent that actual fees and expenses incurred in such subsequent period(s) are less than the

Budgeted Fees and Expenses in such subsequent period(s); provided, however, that nothing shall limit any Professional's right to request, or the Court's power to authorize, the allowance of fees and expenses pursuant to Sections 330 and 331 of the Bankruptcy Code. *Interim Order ¶ 7.*

**Interest Rates:**  The DIP Loans shall bear interest at the rate of 12% per annum, payable in cash in arrears on a monthly basis. *DIP Agreement Sections 1.01 and 2.06.*

**Post Default Rates:**  After the occurrence and during the continuance of any event of default, interest on all DIP Loans and all other outstanding amounts under the DIP Documentation (as defined below) shall bear interest at a rate equal to 2.0% per annum above the otherwise applicable rate, to the fullest extent permitted under applicable law. *DIP Agreement Sections 1.01 and 2.06.*

**Security:**  Except with respect to the Carve-Out (defined below), pursuant to Section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute joint and several allowed senior administrative expense claims (the "Superpriority Claims") against each Debtor with priority over any and all administrative expenses, adequate protection claims and all other claims against the Debtors, including without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code. *DIP Agreement Section 2.15; Interim Order ¶ 8.*

As security for the DIP Obligations, effective and perfected upon the date of the DIP Orders, the following security interests and liens are granted by the Debtors to the DIP Agent, for itself and the benefit of the DIP Lenders (all property of the Debtors identified below being collectively referred to as the "DIP Collateral"), subject and subordinate only to the Carve-Out (all such liens and security interests granted to the DIP Agent pursuant to the DIP Orders, the "DIP Liens"): *DIP Agreement Section 2.15; Interim Order ¶ 9.*

- Pursuant to Section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority lien on, and security interest in, all tangible and intangible prepetition and postpetition property of the Debtors, that is not subject to either (i) valid, perfected and non-avoidable liens in existence at the time of the commencement of the Cases or (ii) valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (collectively, the "**Unencumbered Property**"); provided that such Unencumbered Property shall not include Avoidance Actions, but subject to entry of the Final Order, such Unencumbered Property shall include any proceeds or property recovered in respect of any Avoidance Actions. *DIP Agreement Section 2.15; Interim Order ¶ 9(a).*

- Pursuant to Section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior lien on, and security interest in all tangible and intangible prepetition and postpetition property of the Debtors (other than the property described in paragraph 9(c) of the Interim Order, as to which the DIP Liens will have the priority as described in such paragraph 9(c)), that is subject to valid, perfected and

unavoidable liens in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (collectively, the "**Non-Primed Liens**"), which security interests and liens in favor of the DIP Agent, for itself and the benefit of the DIP Lenders, shall be junior to the Non-Primed Liens. ***DIP Agreement Section 2.15; Interim Order ¶ 9(b).***

- Pursuant to Section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority, senior priming lien on, and security interest in, all of the Debtors' Prepetition Collateral and a valid, binding, fully-perfected senior lien upon all Prepetition Collateral that is subject to any other Lien or obligation on a junior basis to the Prepetition Liens, but junior to any Non-Primed Liens on the Collateral. The DIP Liens on the Debtors' Prepetition Collateral shall be senior in all respects to the Prepetition Liens on the Debtors' Prepetition Collateral, but shall be junior to any Non-Primed Liens on the Debtors' Prepetition Collateral. ***DIP Agreement Section 2.15; Interim Order ¶ 9(c).***

- The DIP Liens and the Adequate Protection Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Section 551 of the Bankruptcy Code, (B) any liens arising after the Petition Date, or (C) any lien of the DIP Loan Parties securing the Prepetition Obligations or (ii) subordinated to or made *pari passu* with any other lien or security interest under Sections 363 or 364 of the Bankruptcy Code or otherwise. ***Interim Order ¶ 9(d).***

**Adequate Protection:**  The Prepetition Lenders and the Prepetition Agent are entitled, pursuant to Sections 361, 363(c)(2), 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, in an amount equal to the aggregate diminution in value of their interests in the Prepetition Collateral (such diminution in value, the "**Adequate Protection Obligations**").  As adequate protection, the Prepetition Lenders and the Prepetition Agent for the benefit of the Prepetition Lenders are granted the following:

- Adequate Protection Liens.  As security for the payment of the Adequate Protection Obligations, (effective upon the date of the Interim Order) a valid, perfected replacement security interest in and lien on all of the DIP Collateral (the "**Adequate Protection Liens**"), subject and subordinate only to (i) the DIP Liens, (ii) the Carve-Out and (iii) the Non-Primed Liens. ***DIP Agreement Section 2.15; Interim Order ¶ 16(a).***

- Section 507(b) Claims.  The Adequate Protection Obligations shall constitute superpriority claims as provided in Section 507(b) of the Bankruptcy Code (the "507(b) Claims"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, subject and subordinate only to (i) the Carve-Out and (ii) the Superpriority Claims granted to the DIP Agent and the Lenders in respect of the DIP Obligations.  Except to the extent expressly set forth in the DIP Orders, the Prepetition Agent and the Prepetition Lenders shall not receive or retain any payments, property in respect of the 507(b) Claims until all DIP

Obligations shall have indefeasibly been paid in full. ***DIP Agreement Section 2.15; Interim Order ¶ 16(b).***

- <u>Interest, Fees and Expenses</u>.  The Debtors are being authorized and directed to (a) immediately accrue, as adequate protection to the Prepetition Lenders, an amount equal to all accrued and unpaid interest on the loans constituting Prepetition Obligations at the non-default LIBOR-based rate under the Prepetition Credit Agreement and (b) on the last Business Day of each calendar month after the entry of the Interim Order, accrue, as adequate protection to the Prepetition Lenders an amount equal to all accrued and unpaid interest on the loans constituting Prepetition Obligations at the applicable non-default LIBOR-based rate set forth in the Prepetition Documents.  As additional adequate protection, the Debtors shall also pay the reasonable and documented expenses of (a) the Prepetition Lenders including, without limitation, the reasonable and documented fees and expenses of the Prepetition Lenders' counsel, local counsel, consultants and advisors, and (b) the Prepetition Agent and its counsel's reasonable and documented fees and expenses. ***Interim Order ¶ 16(c).***

- <u>Sale Proceeds Limitations</u>.  In the event of any sale, lease, transfer, license, or other disposition of property of the Debtors that constitutes Prepetition Collateral or DIP Collateral outside the ordinary course of business (to the extent permitted by the DIP Orders, the DIP Documents and other order of the Court), the Debtors are being authorized and directed, to promptly pay 100% of the net proceeds (including cash or other forms of consideration) resulting therefrom to the DIP Agent for the benefit of the DIP Lenders and after the payment in full of all DIP Obligation, to the Prepetition Agent for the benefit of the Prepetition Lenders.  Except to the extent expressly set forth in the DIP Orders, the Prepetition Agent and the Prepetition Lenders shall not receive or retain any payments, property or other amounts pursuant to paragraph 16(d) of the Interim Order until all DIP Obligations shall have been paid in full. ***Interim Order ¶ 16(d).***

- <u>Information and Other Covenants</u>.  The Debtors shall comply with the reporting requirements set forth in the DIP Agreement and Sections 6.01, 6.02, 6.11 and 6.15 of the Prepetition Credit Agreement, together with such additional information as the Prepetition Lenders may reasonably request from time to time. ***Interim Order ¶ 16(e).***

- <u>Credit Bidding</u>.  The Prepetition Lenders and the DIP Lenders shall have the right to "credit bid" all or a portion of the Prepetition Obligations and the DIP Obligations in connection with any sale of the Prepetition Collateral and the DIP Collateral, including any sale pursuant to Section 363 of the Bankruptcy Code or included as part of any reorganization plan subject to confirmation under Section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code or otherwise. ***Interim Order ¶ 16(f).***

**Commitment Fees:**  The Debtor Borrowers agree to pay to the Administrative Agent, the fees in the amounts and on the dates as set forth in any fee agreements with the Administrative Agent and to perform any other obligations contained therein.  ***DIP Agreement Section 2.07(a)(i)***.

The Debtor Borrowers shall pay to the Lead Lender and the Lenders such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified in the form of additional DIP Loans pursuant to Section 2.01(b). *DIP Agreement Section 2.07(a)(ii)*.

All fees payable under the DIP Agreement shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, in the case of participation fees, to the Lenders. *DIP Agreement Section 2.07(b)*.

**Expenses:** Each of the Borrowers shall pay (i) all reasonable out-of-pocket expenses incurred by the Administrative Agent and the Lead Lender in connection with the DIP Agreement and the other Loan Documents including in connection with the perfection and maintenance of security interests in the Collateral and (ii) all out-of-pocket expenses incurred by the Administrative Agent, the Lead Lender or any Lender in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section and its rights with respect to the Collateral, or (B) in connection with the DIP Loans made, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such DIP Loans. *DIP Agreement Section 10.04(a).*

**Carve-Out:** The "Carve-Out" shall mean (a) any fees payable to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee pursuant to Section 1930(a) of title 28 of the United States Code and (b) up to $750,000 of allowed and unpaid fees and expenses, (regardless of when such fees and expenses become allowed by order of the Bankruptcy Court but consistent with the Budget) of professionals retained by order of the Bankruptcy Court, incurred after the occurrence of a Carve-Out Event (as defined below), and (c) allowed, accrued and unpaid fees and out-of-pocket expenses (regardless of when such fees and expenses become allowed by order of the Bankruptcy Court) of professionals retained by order of the Bankruptcy Court  (or whose application for retention is then pending provided such application is ultimately approved), incurred on or prior to the occurrence of a Carve-Out Event and that are consistent with the Budget.  For the purposes hereof, a "Carve-Out Event" shall occur upon the occurrence and during the continuance of an Event of Default and upon delivery of a written notice thereof by the DIP Agent or any DIP Lender to the Debtors (a "Carve-Out Notice").  So long as no Carve-Out Event shall have occurred and be continuing, the Carve-Out shall not be reduced by the payment of fees, expenses and disbursements of professionals retained by order of this Court allowed by this Court and payable under Sections 328, 330 and 331 of the Bankruptcy Code, which allowed fees, expenses and disbursements shall be paid in accordance with and subject to the Budget. *Interim Order ¶ 8.*

**Events of Default:** Customary events of default, including, among other things, failure to make required payments, default under other debt agreements, and breach of covenants, representations and warranties. *DIP Agreement Section 8.02.*

**Remedies on Default:** If any Event of Default occurs and is continuing, the Administrative Agent may take any or all of the following actions: (a)  declare the Commitment of each Lender to make the DIP Term Loans to be terminated, whereupon such Commitments and obligation shall be terminated; (b) declare the unpaid principal amount of all outstanding DIP Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable; or (c)  exercise all rights and

remedies available to it and the Lenders under the Loan Documents, including rights as a secured creditor; provided, however, that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Non-Debtor Borrowers under the Debtor Relief Laws other than with the consent of the Lead Lender, the obligation of each Lender to make DIP Loans shall automatically terminate, the unpaid principal amount of all outstanding DIP Loans and all interest and other amounts as aforesaid shall automatically become due and payable without further act of the Administrative Agent or any Lender. *DIP Agreement Section 8.02; Interim Order ¶ 10.*

**Automatic Stay:**  The automatic stay under Section 362 of the Bankruptcy Code will be vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise, (upon an Event of Default, all rights and remedies under the DIP Documents, other than those rights and remedies against DIP Collateral, as provided in clause (b) below, and (b) upon an Event of Default, and the giving of five (5) Business Days' prior written notice (the "Waiting Period") to the Debtors (with a copy to counsel to the Debtors, counsel to the Committee (if any) and the U.S. Trustee), all rights and remedies against the DIP Collateral provided for in the DIP Documents and the DIP Orders. *Interim Order ¶ 10.*

**Indemnification:**  Each of the Borrowers shall indemnify the Administrative Agent (and any sub-agent thereof), the Lead Lender, each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against any and all losses, claims, damages, penalties, liabilities and related expenses incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any of the Borrowers in connection with the DIP Loans; unless such losses, claims, damages, penalties, liabilities or related expenses result from the gross negligence or willful misconduct of such Indemnitee as determined by a court of competent jurisdiction in a final non-appealable judgment. *DIP Agreement Section 10.04(b).*

### Highlighted Provisions

17.     Local Rule 4001-2 requires the Debtors to highlight certain provisions included in

the DIP Agreement and the DIP Orders. As discussed herein, the Debtors believe these

provisions are reasonable in light of the facts and circumstances of these Cases and should be

approved.  Indeed, the circumstances of these Cases virtually precluded any other lender from

providing financing that would have alleviated the need for these provisions.  The provisions

under Rule 4001-2(a)(i) of the Local Rules included in the DIP Orders and DIP Agreement are as

follows:

> Local Rule 4001-2(a)(i)(B).  The Debtors are agreeing to the validity, amount, enforceability, unavoidability and perfection of the Prepetition Liens.  To the extent that a committee were to obtain standing, a committee could challenge the prepetition claims and liens. *Interim Order ¶ 4.*

Local Rule 4001-2(a)(i)(C).  Subject to entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral, as the case may be, pursuant to Sections 105 and 506(c) of the Bankruptcy Code or any similar principle of law.  ***Interim Order ¶ 12.***

Local Rule 4001-2(a)(i)(D).  Upon entry of the Final Order, to the extent approved by the Bankruptcy Court, the DIP Lien shall attach to any proceeds of claims and causes of action brought under Sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code.  ***DIP Agreement Section 2.15(a).***

Local Rule 4001-2(a)(i)(E).  Subject to entry of the Final Order, $15,000,000 of aggregate principal amount of loans outstanding under the Prepetition Credit Agreement are receiving liens and priority granted under the DIP Agreement.  ***DIP Agreement Section 2.01.***

Local Rule 4001-2(a)(i)(H).  The Prepetition Agent and the Prepetition Lenders shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code and the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Agent and the Prepetition Lenders with respect to (i) proceeds, products, offspring or profits of any of the Prepetition Collateral, including the Cash Collateral or (ii) the extension of the Adequate Protection Liens to cover proceeds of the Prepetition Collateral.  ***Interim Order ¶ 13.***

### Postpetition Liens and Superpriority Claims

18.     As a condition for the DIP Financing the Debtors seek to provide the DIP Agent, for itself and the benefit of the DIP Lenders, with postpetition security interests and superpriority status as follows:

(a)     **First Lien on Unencumbered Property**.  Effective immediately upon the entry of the Interim Order, the DIP Agent, for itself and the benefit of the DIP Lenders, shall be granted pursuant to section 364(c)(2) of the Bankruptcy Code, DIP Liens senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates except as otherwise provided in the Interim Order, upon the DIP Collateral, including, without limitation, all Unencumbered Property; provided that such Unencumbered Property shall not include

Avoidance Actions, but subject to entry of the Final Order, such Unencumbered Property shall include any proceeds or property recovered in respect of any Avoidance Actions.

        (b)      **Liens Junior to Certain Existing liens**.  Pursuant to Section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior lien on, and security interest in all tangible and intangible prepetition and postpetition property of the Debtors (other than the property described in paragraph 18(c) below, as to which the DIP Liens will have the priority as described in such paragraph 18(c)), whether now existing or hereafter acquired, that is subject to the Non-Primed Liens, which security interests and liens in favor of the DIP Agent, for itself and the benefit of the DIP Lenders, shall be junior to the Non-Primed Liens.

        (c)      **Liens Priming the Prepetition Liens**.  Pursuant to Section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority, senior priming lien on, and security interest in, all of the Debtors' Prepetition Collateral (whether now existing or hereafter acquired).  The DIP Liens on the Debtors' Prepetition Collateral shall be senior in all respects to (i) the Prepetition Liens (including without limitation the Adequate Protection Liens) on the Debtors' Prepetition Collateral and (ii) all other liens and obligations secured by the Debtors' Prepetition Collateral on a junior basis to the Prepetition Liens, but shall be junior to any Non-Primed Liens on the Debtors' Prepetition Collateral.  The Prepetition Agent shall (x) turnover to the DIP Agent all Possessory Collateral within two business days of entry of the Interim Order, in which case the DIP Agent shall act as bailee on behalf of the Prepetition Agent for purposes of perfection in the Possessory Collateral, (y)  act as bailee on behalf of the DIP Agent for purposes of perfection in the Possessory Collateral or (z) enter into such other arrangements with respect to the Possessory Collateral as may be reasonably agreed between the

Prepetition Agent and the DIP Agent.  The Prepetition Secured Parties consent to the priming of any and all liens pursuant to the DIP Orders.

(d)    **Liens Senior to Certain Other Liens**.  The DIP Liens and the Adequate Protection Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Section 551 of the Bankruptcy Code, (B) any liens arising after the Petition Date, or (C) any lien of the DIP Loan Parties securing the Prepetition Obligations or (ii) subordinated to or made pari passu with any other lien or security interest under Sections 363 or 364 of the Bankruptcy Code or otherwise.

(e)    **Superpriority Claims.**  Except to the extent expressly set forth in the DIP Orders in respect of the Carve-Out, pursuant to Section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall be joint and several Superpriority Claims against each Debtor with priority over any and all administrative expenses, adequate protection claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment.

**Adequate Protection of Prepetition Lenders**

19.    As adequate protection to guard against the diminution in the value of the interests of the Prepetition Lenders and the Prepetition Agent (for the benefit of the Prepetition Lenders) in the Prepetition Collateral (including Cash Collateral) on account of the granting of the DIP Liens, subordination to the Carve Out, the Debtors' use of Cash Collateral and other decline in value arising out of the automatic stay or the Debtors' use, sale, depreciation, or

disposition of the Prepetition Collateral, the Debtors will provide adequate protection to the Prepetition Lenders and the Prepetition Agent (for the benefit of the Prepetition Lenders) as follows:

    (a)    **Adequate Protection Liens**.  As security for the payment of the Adequate Protection Obligations, the Prepetition Lenders and the Prepetition Agent for the benefit of the Prepetition Lenders are hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements or other agreements) the Adequate Protection Liens, subject and subordinate only to (i) the DIP Liens, (ii) the Carve-Out and (iii) the Non-Primed Liens.

    (b)    **Section 507(b) Claims**.   The Adequate Protection Obligations shall constitute 507(b) Claims, with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, Sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, subject and subordinate only to (i) the Carve-Out and (ii) the Superpriority Claims granted in respect of the DIP Obligations.  Except to the extent expressly set forth in the DIP Orders, the Prepetition Agent and the Prepetition Lenders shall not receive or retain any payments, property or other amounts in respect of the 507(b) Claims unless and until all DIP Obligations shall have indefeasibly been paid in full in cash.

    (c)    **Interest, Fees and Expenses**.  The Debtors are authorized and directed to (a) immediately accrue, as adequate protection to the Prepetition Lenders, an amount equal to all accrued and unpaid interest on the loans constituting Prepetition Obligations at the non-default LIBOR-based rate under the Prepetition Credit Agreement and (b) on the last Business Day of

each calendar month after the entry of the Interim Order, accrue, as adequate protection to the Prepetition Lenders an amount equal to all accrued and unpaid interest on the loans constituting Prepetition Obligations at the applicable non-default LIBOR-based rate set forth in the Prepetition Documents.  As additional adequate protection, the Debtors shall also pay the reasonable and documented expenses of (a) the Prepetition Lenders including, without limitation, the reasonable and documented fees and expenses of the Prepetition Lenders' counsel, local counsel, consultants and advisors, and (b) the Prepetition Agent and its counsel's reasonable and documented fees and expenses.  None of the fees and expenses payable pursuant to paragraph 16(c) of the Interim Order shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto.  The Debtors shall pay the reasonable and documented fees and expenses provided for in paragraph 16(c) to the Interim Order within ten (10) days following receipt of invoices therefor by the Debtors, the counsel for the Committee (if any) and the U.S. Trustee, provided that, upon any objection to the reasonableness of such fees, the Debtors shall pay all amounts that are not the subject of such objection within the ten (10) day period and shall pay the balance following the resolution of such objection or upon an order of the Court.

   (d) **Sale Proceeds Limitations**.  Except in accordance with the Bidding Procedures Order (as defined in the Sale Motion) and the DIP Documents, the Debtors shall not sell, lease, transfer or otherwise dispose of their interest in the Prepetition Collateral or the DIP Collateral , or seek authority of this Court to do any of the foregoing, without the prior written consent of the DIP Lenders.  In the event of any sale, lease, transfer, license, or other disposition of property of the Debtors that constitutes Prepetition Collateral or DIP Collateral outside the

ordinary course of business (to the extent permitted by the DIP Orders, the DIP Documents and the Bidding Procedures Order), the Debtors are authorized and directed, without further notice or order of this Court, to promptly pay 100% of the net proceeds (including cash or other forms of consideration) resulting therefrom to the DIP Agent for the benefit of the DIP Lenders and after the payment in full of all DIP Obligation, to the Prepetition Agent for the benefit of the Prepetition Lenders.  Except to the extent expressly set forth in the DIP Orders, the Prepetition Agent and the Prepetition Lenders shall not receive or retain any payments, property or other amounts pursuant to paragraph 16(d) of the Interim Order unless and until all DIP Obligations shall have indefeasibly been paid in full in cash.

(e)     **Information and Other Covenants**.  The Debtors shall comply with the reporting requirements set forth in the DIP Agreement and Sections 6.01, 6.02, 6.11 and 6.15of the Prepetition Credit Agreement, together with such additional information as the Prepetition Lenders may reasonably request from time to time.

(f)     **Credit Bidding**.  The Prepetition Lenders and the DIP Lenders shall have the right to "credit bid" all or a portion of the Prepetition Obligations and the DIP Obligations in connection with any sale of the Prepetition Collateral and the DIP Collateral, including without limitation, any sale pursuant to Section 363 of the Bankruptcy Code or included as part of any reorganization plan subject to confirmation under Section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code or otherwise without the need for further order authorizing the same.

**Basis for Relief Requested**

## I.     The DIP Financing Should Be Approved

20.     Prior to the filing of these Cases, the Debtors entered into negotiations with the Stalking Horse Purchaser for the sale of substantially all of the MMBU Debtors' assets.  In connection with those negotiations, affiliates of the Stalking Horse Purchaser purchased the debt

under the Prepetition Credit Agreement. Now, as the stalking-horse bidder proposed by the Sale

Motion and as Prepetition Secured Party, the Stalking Horse Purchaser is not only the most

logical choice, but practically speaking, the only choice, to provide the Debtors with debtor-in-

possession financing.

21.     The DIP Agreement has been negotiated in good faith and at arm's length by and

among the Debtors and the DIP Lenders.  The Debtors submit that the terms thereof, the use of

Cash Collateral, and all other financial accommodations provided under the DIP Agreement and

the DIP Orders are fair and reasonable, and reflect the Debtors' exercise of prudent business

judgment consistent with their fiduciary duties.  The Debtors have, in their business judgment,

determined that entering into the DIP Agreement will give the Debtors the financing needed to

operate its business with minimum interruption or disruption to its operations and thus preserve

the going concern value of the Debtors' estates.  In addition, the Debtors have, in their business

judgment, determined that the DIP Financing provides the Debtors with the greatest degree of

flexibility to implement their chapter 11 strategy.

22.     As described above, the Debtors' chapter 11 efforts hinge upon use of Cash

Collateral and obtaining access to postpetition financing.  Bankruptcy Code § 364 distinguishes

among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured

credit outside the ordinary course of business, and (c) obtaining credit with specialized priority

or on a secured basis.  If a debtor-in-possession cannot obtain postpetition credit on an unsecured

basis, pursuant to § 364(c), the court may authorize such debtor to obtain credit or incur debt that

is entitled to superpriority administrative expense status and/or secured by a senior lien on

unencumbered property, a junior lien on encumbered property or a combination of the foregoing.

In addition, pursuant to § 364(d), absent consent from affected secured parties, a court may

authorize postpetition credit secured by a senior or equal lien on encumbered property (i.e., a "priming" lien) when a debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected.

**A.    Incurrence of Secured Superpriority Debt Under Bankruptcy Code §§ 364(c) and 364(d)**

23.    Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that debtors in possession cannot "obtain unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense."  See Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp., 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense); In re Klein Sleep Prods., Inc., 173 B.R. 296, 297-98 (S.D.N.Y. 1994) (same); In re Ames Dept. Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it made reasonable efforts to seek other sources of financing under §§ 364(a) and (b)); In re Garland Corp., 6 B.R. 456, 461 (1st Cir. BAP 1980) (secured credit under § 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking unsecured credit under § 364(c) of the Bankruptcy Code must prove that it cannot obtain unsecured credit pursuant to § 364(b)).

24.    As described above, at the Final Hearing, the Debtors are requesting that Court approve $15,000,000 of aggregate principal amount of loans outstanding under the Prepetition Credit Agreement to be given the same priority and liens as the DIP Financing.  This treatment of the obligations under the Prepetition Credit Agreement was an essential element of the overall DIP Financing and should be approved because the DIP Lenders would not agree to provide the DIP Financing without such a provision.  Further, the Debtors were not able to find debtor-in-possession financing from another party on other terms, let alone terms that did not include a

roll-up of the debtor's obligations under the Prepetition Credit Agreement.  This Court has

previously approved similar debtor-in-possession financing agreements where the debtor was not

able to obtain debtor-in-possession financing under other conditions.  See, e.g., In re Digital

Domain Media Group, Inc., et al., Case No. 12-12568 (BLS) (Bankr. D. Del. Nov. 7, 2012); In re

Real Mex Restaurants, Inc. et al., Case No. 11-13122 (BLS) (Bankr. D. Del. Nov. 9, 2011); In re

Landsource Communities Development LLC, et al., Case No. 08-11111 (KJC) (Bankr. D. Del.

July 21, 2008).

      25.    In addition, Bankruptcy Code § 364(d)(1), which governs the incurrence of

postpetition debt secured by senior or "priming" liens, provides that the court may, after notice

and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or
> equal lien on property of the estate that is subject to a lien only if –
>
>     (A)    the trustee is unable to obtain credit otherwise; and
>
>     (B)    there is adequate protection of the interest of the holder of the lien
>     on the property of the estate on which such senior or equal lien is
>     proposed to be granted.

11 U.S.C. 364(d)(1).

      26.    A debtor need only demonstrate "by a good faith effort that credit was not

available" without the protections afforded to potential lenders by Bankruptcy Code §§ 364(c) or

364(d). Mosello, 195 B.R. at 289 (citing In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir.

1986)).  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before

concluding that such credit is unavailable." Ames, 115 B.R. at 40 (holding that debtor made

reasonable effort to secure financing when it selected the least onerous financing option from the

remaining two lenders).  Moreover, where few lenders likely can or will extend the necessary

credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an

exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga.

1988), aff'd sub nom., Anchor Savings Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4

(N.D. Ga. 1989).

27.     The Debtors selected the DIP Financing provided by the DIP Lenders only after

carefully examining all of its options.  In the end, it was not feasible for the Debtors to obtain a

loan on equal to or better terms that afforded the Debtors sufficient liquidity to operate their

business.  In addition, the Debtors were unable to obtain financing on an unsecured basis or

obtain an equity investment from any potential strategic partner.

28.     In the end, the DIP Lenders provided the only viable source of funding.

Accordingly, the Debtors commenced vigorous, arm's length and good faith negotiations with

the DIP Lenders for the DIP Financing.

29.     After fully considering their financing options, and whether other more

advantageous financing alternatives would be available to the Debtors, the Debtors, exercising

their sound business judgment, decided to accept the DIP Financing with the DIP Lenders.  The

DIP Financing provides significant advantages and favorable terms that the Debtors believe

would be unavailable through other lenders.  Further, the Debtors note that the Prepetition

Secured Parties that will be primed by the liens granted to the DIP Lenders have consented to the

relief requested herein (subject to the adequate protection described above).

**B.     Adequate Protection Under Bankruptcy Code §§ 364(d) and 361**

30.     In connection with the DIP Financing, the Debtors propose providing the

Prepetition Lenders and the Prepetition Agent (for the benefit of the Prepetition Lenders) with

adequate protection in accordance with sections 364(d) and 361 of the Bankruptcy Code.[6]  To

that end, the Debtors and the Prepetition Lenders have negotiated, and the Debtors request that

the Court approve, as of the Petition Date, certain protections of the interests of the Prepetition

Lenders and the Prepetition Agent (for the benefit of the Prepetition Lenders) in the Prepetition

Collateral from any diminution in value of each of their respective interests in the Prepetition

Collateral resulting from the Debtors' use, sale or lease of such collateral, and the imposition of

the automatic stay.

31.     Pursuant to Bankruptcy Code § 363(c)(2), a debtor-in-possession may not use

cash collateral without the consent of the secured party or court approval.  Bankruptcy Code

§ 363(e) provides that, upon request of an entity that has an interest in property to be used by a

debtor, the court shall prohibit or condition such use as necessary to provide adequate protection

of such interest.  Under Bankruptcy Code § 364(d), a debtor may obtain credit secured by a

senior or equal lien if an existing secured creditor's interest in the collateral security is

adequately protected.

32.     What constitutes adequate protection is decided on a case-by-case basis.  See In re

Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); In re Swedeland Dev. Group, Inc., 16 F.3d

552, 56 (3d Cir. 1994); In re Realty Southwest Assocs., 140 B.R. 360 (Bankr. S.D.N.Y. 1992); In

re Beker Indus. Corp., 58 B.R. 725 (Bankr. S.D.N.Y. 1986); see also In re O'Connor, 808 F.2d

1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985).  By adequate protection,

the Code seeks to shield a secured creditor from diminution in the value of its interest in the

particular collateral during the period of use.  See In re 495 Central Park Avenue Corp., 136 B.R.

---

[6]     Bankruptcy Code section 364(d) requires that adequate protection be provided where the liens of secured creditors are being primed to secure the obligations under a debtor-in-possession financing facility.  See 11 U.S.C. § 364(d).

626, 631 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. at 736; In re Hubbard Power & Light, 202 B.R. 680 (Bankr. E.D.N.Y. 1996).  When priming of liens is sought pursuant to section 364(d) of the Bankruptcy Code, courts also examine whether the prepetition secured creditors are being provided adequate protection for the value of their liens.  Beker, 58 B.R. at 737.  Because all of these tests are satisfied here and the Debtors have met all of their obligations under section 364 of the Bankruptcy Code, the Motion should be granted and the DIP Financing Agreements should be approved.

33.     Section 361(2)-(3) of the Bankruptcy Code expressly describes replacement liens and administrative claim status as appropriate forms of adequate protection.  Thus, the provision of these forms of adequate protection is appropriate.  Further, payment of reasonable and documented out-of-pocket fees, costs and expenses often serves as a form of adequate protection for secured creditors.  Agreeing to pay the reasonable and documented out-of-pocket fees, costs and expenses offers meaningful additional protection to any diminution in the value of the Prepetition Collateral.  Accordingly, the Debtors believe that the adequate protection described above is fair, reasonable, and sufficient to protect any diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral during the period their collateral is used by the Debtors.

### C.     The DIP Financing is Necessary to Preserve the Assets of the Debtors' Estates

34.     The Debtors must immediately instill the Debtors' employees, vendors, service providers and customers with confidence that these Cases will not erode the Debtors' overall value.  The Debtors believe that they must provide their various constituents with confidence in their ability to seamlessly transition their businesses into chapter 11, operate their businesses normally in that environment and ultimately to sell the business in a successful and expedient

manner.  The DIP Financing will provide the working capital necessary to allow the Debtors to, among other things, continue operating the Debtors' businesses in the ordinary course of business, which in turn will help maintain value for the benefit of all creditors and parties in interest.

35.    The initial success of the Cases at the outset depends on the confidence of the Debtors' constituents, which in turn depends upon the Debtors' ability to minimize the disruption of the bankruptcy filings.  Approval and implementation of the DIP Financing will assure continued functioning of the Debtors and preserve the going concern value of their estates.

**D.    The Terms of the DIP Financing are Fair, Reasonable and Appropriate**

36.    After appropriate investigation and analysis, the Debtors' management has concluded that the DIP Financing presents the best alternative available under the circumstances. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision fails the arbitrary and capricious standard.  See Ames 115 B.R. at 40 (courts should approve borrowings pursuant to 364(c) and (d) if the debtors was within its business judgment); In re Mid-State Raceway, Inc., 323 B.R. 40, 58-59 (Bankr. N.D.N.Y. 2005) (same); In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of interim loan, receivables facility and asset-based facility "reflect[ed] sound and prudent business judgment...[was] reasonable under the circumstances and in the best interest of [the debtor] and its creditors"); cf. Group of Institutional Investors v. Chicago, Mil., St. P. & Pac. Ry., 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to business judgment of the debtor); In re Simasko Prods. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court").  Indeed, "more exacting scrutiny [of the debtor's business decisions] would slow the administration of the Debtor's estate and increase its cost, interfere

with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

37.     The terms and conditions of the DIP Financing are fair and reasonable and were negotiated by the parties in good faith and at arms' length.  In the reasonable exercise of the Debtors' business judgment, the DIP Financing is the best financing option available under the present circumstances.  As discussed above, the Debtors, with the assistance of its advisors, assessed their financing needs and the DIP Financing proposal.  After fully considering all of the Debtors' realistic options, and whether other more advantageous financing alternatives were available to the Debtors, the Debtors decided to accept the DIP Financing with the DIP Lenders.

38.     Further, the proposed DIP Financing subjects the security interests and administrative expense claims of the DIP Lenders to the Carve-Out, as described above, thereby ensuring that in the event of a default under the DIP Agreements the Debtors' estates or other parties-in-interest are not directly or indirectly deprived of possible rights and powers by restricting the services for which professionals may be paid in these cases.  In Ames Dept. Stores, the court found such carve-outs for professional fees not only reasonable but necessary to ensure that official committees and debtors' estates can retain assistance from counsel.  See Ames, 115 B.R. at 38, 40 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "absent such protection, the collective rights and expectation of all parties-in-interest are sorely prejudiced").

## II.     Interim Approval Should Be Granted

39.     The Debtors bring this Motion to obtain authorization to use Cash Collateral and borrow under the DIP Agreement on an expedited basis due to the immediate and irreparable harm that would be suffered by the Debtors' estates if the Debtors cannot obtain the financing

needed to sustain the Debtors' businesses as going concerns while the Debtors implement and consummate the sale of substantially all of their assets.  The Debtors have an immediate need to obtain the DIP Financing and use Cash Collateral to permit them, in addition to financing the administration of these Chapter 11 Cases, to (a) operate the Debtors' businesses, (b) maintain business relationships with vendors, suppliers and customers, (c) pay employee wages in the ordinary course, (d) make necessary capital expenditures, (e) satisfy other working capital and operational needs, and (f) financing the sale process, all of which are necessary to preserve the Debtors' going-concern value.

40.    Without the use of Cash Collateral and the additional liquidity, the Debtors will not be able to meet their day-to-day operational needs.  If unable to meet the day-to-day operational needs, the Debtors would have to halt their operations which would drastically erode the overall value of the Debtors.  Further, the Debtors must demonstrate to their customers and vendors that the Debtors have sufficient capital to ensure ongoing operations in the ordinary course – thereby assuaging any potential fears among the constituents of the Debtors that these Chapter 11 Cases will negatively affect the Debtors' operations.  Therefore, the Debtors request approval of the DIP Financing on an expedited basis due to the immediate and irreparable harm that would be suffered by the Debtors' estates if the Debtors cannot obtain the financing needed to sustain the Debtors' businesses.

41.    Rule 4001(c) of the Bankruptcy Rules permits a court to approve a debtor's request for financing during the 14-day period following the filing of a motion requesting authorization to obtain postpetition financing "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  In examining requests under this rule, courts apply the same business judgment standard as is applicable to other business

decisions. <u>See</u>, <u>e.g.</u>, <u>Ames</u>, 115 B.R. at 38.  After the 14-day period, the rule does not limit the request to those amounts necessary to avoid immediate and irreparable harm, and the debtor can borrow those amounts it views as prudent to the operation of its business. <u>Id.</u> at 36.

42.     The Debtors request that the Court conduct an expedited preliminary hearing on the Motion and authorize the Debtors from and after the entry of the Interim Orders until the Final Hearing to obtain credit under the DIP Agreement, which the Debtors shall use to, among other things, provide working capital for the Debtors and pay expenses for these Chapter 11 Cases.  This authority will allow the Debtors to maintain ongoing operations and avoid immediate and irreparable harm and prejudice to their estates and all parties-in-interest pending the conclusion of the Final Hearing.

43.     Absent this Court's approval of the interim relief sought in this Motion, the Debtors face a substantial risk of severe disruption to their business operations and irreparable damage to their relationships with customers and vendors—the result of which would be a catastrophic erosion of the value of the Debtors' estates.  Simply put, the relief sought herein will allow the Debtors to ensure that the Debtors' businesses continue to operate during the Chapter 11 Cases.

## III.     Request for Final Hearing

44.     Pursuant to Rules 4001(b)(2) and 4001(c)(2) of the Bankruptcy Rules, the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable but in no event later than 30 days following the Petition Date.  At the Final Hearing, the Debtors will request Court authority to obtain up to obtain credit under the DIP Agreement.

45.     The Debtors request authorization to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the

Notice Parties (defined below).  The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Rule 4001 of the Bankruptcy Rules.

## Modification of the Automatic Stay

46.     Bankruptcy Code section 362 provides for an automatic stay upon the filing of a bankruptcy petition.  The DIP Financing Agreements require a modification of the automatic stay to implement the terms of the DIP Financing Agreements.

47.     Stay modification provisions of this kind are ordinary and standard features of postpetition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  As noted above, the Debtors are unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient and readily available to maintain ongoing operations.  Nor have the Debtors been able to obtain debtor-in-possession financing on terms more favorable than those proposed herein.  The terms and conditions of the DIP Financing, including the modification of the automatic stay described above, are fair and reasonable, and were negotiated extensively by well-represented parties in good faith and at arm's length.  In these circumstances, and importantly, in light of the material benefits afforded to the Debtors by the DIP Financing, the modification of the automatic stay is more than warranted.

## Request for Waiver of Stay

48.     The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the DIP Financing is essential to prevent potentially irreparable damage to the Debtors' operations, value and ability to reorganize.  Accordingly, the Debtors submit that ample cause

exists to justify a waiver of the fourteen-day stay imposed by Rule 6004(h) of the Bankruptcy Rules, to the extent it applies.

## Notice

49.     Notice of this Application shall be provided to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the Debtors' twenty largest unsecured creditors on a consolidated basis; (c) counsel to the Prepetition Agent; (d) counsel to the DIP Agent; (e) counsel to the DIP Lenders; (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) the Securities and Exchange Commission; and (i) all non-Debtor subsidiaries of the Parent.  As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Del. Bankr. L.R. 9013-1(m).  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief herein, the Debtors respectfully submit that no further notice of this Motion is required.

## No Prior Request

50.     No prior Motion for the relief requested herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request entry of the Interim Order attached

hereto as Exhibit A, and a Final Order, granting the relief requested herein, and granting such

other and further relief as is just and proper.

Dated:  November 4, 2013                    Respectfully submitted,
        Wilmington, Delaware

                                             /s/ Stuart M. Brown
                                            Stuart M. Brown (DE 4050)
                                            DLA PIPER LLP (US)
                                            1201 North Market Street, Suite 2100
                                            Wilmington, Delaware 19801
                                            Telephone:  (302) 468-5700
                                            Facsimile:  (302) 394-2341
                                            Email:    stuart.brown@dlapiper.com

                                                       -and-

                                            Richard A. Chesley (IL 6240877)
                                            Matthew M. Murphy (IL 6257958)
                                            Chun I. Jang (DE 4790)
                                            DLA PIPER LLP (US)
                                            203 N. LaSalle Street, Suite 1900
                                            Chicago, Illinois 60601
                                            Telephone:  (312) 368-4000
                                            Facsimile:  (312) 236-7516
                                            Email:    richard.chesley@dlapiper.com
                                                       matt.murphy@dlapiper.com
                                                       chun.jang@dlapiper.com

                                            PROPOSED ATTORNEYS FOR DEBTORS AND
                                            DEBTORS IN POSSESSION