## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------x
                                        :  Chapter 11
In re                                   :
                                        :  Case No. 13-_____ (____)
Velti Inc., et al.,¹                    :
                                        :
                                        :  (Joint Administration Pending)
               Debtors.                 :
                                        x
-----------------------------------------------------------
```

**MOTION OF THE MMBU DEBTORS AND DEBTORS IN POSSESSION PURSUANT TO SECTIONS 105(A), 363 AND 365 OF THE BANKRUPTCY CODE FOR AN ORDER (I)(A) APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE MMBU DEBTORS' ASSETS, INCLUDING AS RELATED TO THE MMBU BUSINESS; (B) APPROVING STALKING HORSE PURCHASER AND EXPENSE REIMBURSEMENT; (C) SCHEDULING THE RELATED AUCTION AND HEARING TO CONSIDER APPROVAL OF SALE; (D) APPROVING PROCEDURES RELATED TO THE ASSUMPTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (E) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (F) GRANTING RELATED RELIEF; AND (II)(A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE MMBU DEBTORS' ASSETS, INCLUDING AS RELATED TO THE MMBU BUSINESS PURSUANT TO SUCCESSFUL BIDDER'S ASSET PURCHASE AGREEMENT FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors") hereby move the

Court (the "Motion") for the entry of an order pursuant to sections 105(a), 363 and 365 title 11 of

the United States Code (the "Bankruptcy Code"), Rules 2002, 6005, 6006, 9007 and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 6004-1

---

¹ The Debtors are the following six entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Velti, Inc. (4475), Air2Web, Inc. (5572), Air2Web Interactive, Inc. (2364), Velti North America, Inc. (8900), Velti North America Holdings, Inc. (3953) and Velti US Holdings, Inc. (8299). The mailing address of each of the Debtors, solely for purposes of notices and communications, is Spear Tower, 1 Market Street Suite 1400, San Francisco, California 94105.

of the Local Rules Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for an order (i)(a) approving procedures in connection with the sale (the "Sale") of substantially all assets of Velti Inc., Air2Web Inc. and Air 2Web Interactive, Inc. (collectively, the "MMBU Debtors"), including as related to the mobile marketing business unit ("MMBU"); (b) approving the Stalking Horse Purchaser (as defined below) and the Expense Reimbursement (as defined below); (c) scheduling the related auction and hearing to consider approval of the Sale (d) approving procedures related to the assumption of certain executory contracts and unexpired leases; (e) approving the form and manner of notice thereof; and (f) granting related relief; and (ii)(a) authorizing the Sale of such assets free and clear of Encumbrances[2] and other interests, except as provided in an Stalking Horse Agreement (as defined below); (b) approving the assumption and assignment of certain of the MMBU Debtors' executory contracts and unexpired leases related thereto; and (c) granting relief related relief.  In support of this Motion, the MMBU Debtors respectfully state as follows:

### Jurisdiction and Venue

1.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

### Background

2.      On November 4, 2013 (the  "Petition Date"), each of the Debtors filed with this Court voluntary petitions for relief under the Bankruptcy Code.

---

[2]      Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Stalking Horse Agreement (as defined below).

3.      The Debtors are direct and indirect subsidiaries of Velti plc ("PLC" and together with its affiliates, the "Company"), which is incorporated under the laws of Jersey, Channel Islands and traded on the NASDAQ.  The Company is a leading global provider of mobile marketing and advertising technology that enables brands, advertising agencies, mobile operators and media companies to implement highly targeted, interactive and measurable campaigns by communicating with and engaging consumers via their mobile devices.

4.      The Company currently operates through three separate divisions, Mobile Marketing, Performance Marketing and Advertising.  MMBU offers a business-to-business service that assists enterprises in optimally engaging their end user customers utilizing MMBU's technology through the mobile channel.  The MMBU's integrated mobile marketing solutions allow enterprises to reach new audiences with interactive strategies, build mobile communities, acquire new customers and provide mobile-based CRM services.

5.      The MMBU consists largely of the Company's affiliates debtor Air2Web, Inc. ("A2W") and Mobile Interactive Group, Ltd. ("MIG"), a company formed under the laws of England and Wales.   In addition, A2W relies heavily upon its affiliated company, Velti Inc. ("Velti"), for accounting, human resources and other services.  Certain other critical assets of the MMBU are also housed within Velti.  Velti's  principal executive offices are located in San Francisco, California, and A2W's principal offices are located in Atlanta, Georgia.  A2W also owns 99% of an Indian subsidiary, Velti India Private, Ltd, which is engaged in the MMBU within India and provides critical services to other members of the MMBU family of companies.  In addition, certain other assets of the MMBU are held at PLC and at the Company's subsidiaries in the United Kingdom, British Virgin Islands and the Netherlands.

6.      Velti, A2W and certain affiliates are parties or guarantors to a Credit Agreement dated as of August 10, 2012 (the "Credit Agreement") with HSBC Bank USA, National Association, as Administrative Agent ("HSBC").  As of the Petition Date, the amount outstanding under the Credit Agreement was approximately $57.5 million, exclusive of outstanding interest.  The Company had been in default under the Credit Agreement for nearly a year, and during that time had attempted to work with its lenders under the Credit Agreement regarding additional financing to allow the Company to restructure its operations or bridge toward a strategic transaction.  With these efforts proving unsuccessful and the Debtors' liquidity situation deteriorating rapidly, the Company and its advisors began to immediately explore a range of strategic alternatives.  These results led to a series of transactions that began on November 1, 2013, when the debt outstanding under the Credit Agreement was purchased by GSO Credit–A Partners LP, GSO Palmetto Opportunistic Investment Partners LP and GSO Coastline Partners LP (together, "GSO"), which are owned by GSO Capital Partners, the credit division of Blackstone.

7.      With the sale of the debt under the Credit Agreement having been completed, GSO has agreed to provide debtor-in-possession financing that is critical for Debtors to continue to operate their businesses, and begin to remedy the damage to the business caused by their dearth of liquidity.  Finally, GSO and the MMBU Debtors have reached an agreement under which GSO has agreed to purchase the MMBU, including the those related assets owned by the MMBU Debtors, subject to a competitive bidding process.  With the Debtors having suffered through considerable operating and financial stresses during the past year, an expedited sale of their business is essential to not only preserving the underlying value of their operations by

providing customers and employees with a clear path forward, but in satisfying the obligations to their creditors.

**Preliminary Statement**

8.      The MMBU Debtors have determined, in the exercise of their business judgment and in consultation with their professionals, that maximizing the value of the MMBU Debtors' estates is best accomplished through the sale, free and clear of Encumbrances, of certain tangible and intangible assets related to the MMBU (as defined in the Stalking Horse Agreement, the "Purchased Assets") of the MMBU Debtors.

9.      The MMBU Debtors, along with Velti Netherlands B.V., PLC, and Velti Mobile Platforms Limited (collectively, the "Sellers") have agreed to the terms of an asset purchase agreement between the Sellers on the one hand and GSO MMBU Acquisition LLC (the "Stalking Horse Purchaser") on the other hand, pursuant to which the Stalking Horse Purchaser shall acquire the Purchased Assets on the terms and conditions specified therein (together with the schedules and related documents thereto,[3] the "Stalking Horse Agreement," a copy of which is attached as Exhibit 3 to the Bidding Procedures Order (defined below)).  The sale transaction pursuant to the Stalking Horse Agreement is subject to competitive bidding as set forth herein, however, owing to the extensive marketing efforts that have been conducted, the bidding timeline is appropriately tailored.  Pursuant to the terms of the Stalking Horse Agreement, the Stalking Horse Purchaser has agreed to purchase the Purchased Assets for (A) the assumption of certain liabilities, (B) a reduction in an amount equal to $26.25 million in the aggregate amounts outstanding under the DIP Financing Agreement (as such term is defined in the Stalking Horse

---

[3]      Certain of the schedules and related documents have not been filed with this motion, but will be finalized by the Sellers and the Stalking Horse Purchaser and filed no later than November 15, 2013.

Agreement) (the "DIP Credit Bid and Release"), (C) a reduction in an amount equal to $3.75 million of the aggregate amount outstanding under the Credit Agreement (the "Prepetition Credit Bid and Release"), and (D) cash in an amount equal to $1,250,000 for payment of cure costs for Assumed Executory Contracts (defined below) and certain other costs and expenses (collectively, the "Stalking Horse Purchase Price").  The Stalking Horse Purchaser, in making this offer, has relied on the agreement by the MMBU Debtors to seek the Court's approval of reimbursement of its reasonable expenses, and in reasonable expectation that this Court would enter an order providing such relief.  The MMBU Debtors, in the exercise of their business judgment, believe that the reimbursement of the Stalking Horse Bidder's reasonable expenses are a necessary inducement for the Stalking Horse Purchaser, and thus, necessary to establish a "floor" for the Sale of the Purchased Assets and ultimately encourage competitive bidding and the realization of the highest value for the Purchased Assets.

10.     The MMBU Debtors and their investment banker believe that the timeline for the marketing and sale of the Purchased Assets is adequate and critical under the circumstances, especially considering the limited liquidity and extensive marketing efforts that have already occurred with respect to the business.  Prior to the Petition Date, the MMBU Debtors and their investment banker have undertaken significant marketing efforts for the Purchased Assets.  Based on those efforts, the MMBU Debtors secured the Stalking Horse Agreement.  There is a limited universe of potential acquirers of the Purchased Assets, and, the MMBU Debtors and their investment banker have been active in discussions with most, if not all, of these potential purchasers.  However, given the significant liquidity constraints faced by the MMBU Debtors and the immediate degradation to enterprise value, the MMBU Debtors have determined that obtaining immediate approval of the Bidding Procedures is critical to maintaining the value of

these estates.  Nonetheless, the MMBU Debtors believe that the Bidding Procedures provide sufficient time for an adequate market check.

11.     The MMBU Debtors believe that the Sale of the Purchased Assets pursuant to the procedures and on the timeline proposed herein presents the best opportunity to maximize the value of the Purchased Assets for all stakeholders.  Moreover, the rapid transition to new ownership will maximize the realizable value of the Purchased Assets for the MMBU Debtors.

## Relief Requested[4]

12.     *First*, the MMBU Debtors request entry of an order, attached hereto as Exhibit B (the "Bidding Procedures Order"):  (A) approving procedures (the "Bidding Procedures," the form of which is attached thereto as Exhibit 1) for (i) submitting bids for any or all of the Purchased Assets of the MMBU Debtors and (ii) conducting an auction (the "Auction") with respect to the Purchased Assets in the event the MMBU Debtors receive at least one additional Qualified Bid (as defined below); (B) approving the Stalking Horse Purchaser and the Expense Reimbursement; (C) scheduling the Auction for December 9, 2013 at 10:00 a.m. (prevailing Eastern time) at the offices of DLA Piper LLP (US), 1251 Avenue of the Americas, 27th Floor, New York, NY 10020, or at such other place, date and time as may be designated by the MMBU Debtors and scheduling a hearing to approve any sale of Purchased Assets with respect to any bid(s) accepted by the MMBU Debtors on or before December 16, 2013 (the "Sale Hearing"); (D) approving procedures (the "Cure Procedures"), as set forth below, for the assumption and assignment of certain executory contracts (the "Contracts") and unexpired leases (the "Leases") of the MMBU Debtors to any purchaser(s) of the Purchased Assets, and to

---

[4] In compliance with Local Rule 6004-1 and for the convenience of the reader, the salient terms of the transaction as currently set forth in the Stalking Horse Agreement have been summarized and are attached hereto as Exhibit A.

resolve any objections thereto; and (E) approving (i) the form of notice of the Auction and Sale (the "Procedures Notice"), attached to the Bidding Procedures Order as Exhibit 4, to be served on the Procedures Notice Parties (as defined below) and (ii) the form of notice to parties holding Contracts and Leases likely to be assumed and assigned in connection with the Sale of Purchased Assets, in the form attached to the Bidding Procedures Order as Exhibit 5 (the "Cure Notice").

13.      *Second*, the MMBU Debtors will request entry of an order in the form attached hereto as Exhibit C (the "Sale Order") by no later than December 16, 2013, pursuant to sections 105, 363 and 365 of the Bankruptcy Code:  (i) approving the Sale of the Purchased Assets of the MMBU Debtors to the Purchaser, free and clear of all Encumbrances and other interests, except as provided in an Stalking Horse Agreement (as defined below) and authorizing the MMBU Debtors to consummate the Sale of the Purchased Assets and all documents, agreements and contracts executed in conjunction therewith, and (ii) approving the assumption and assignment of the Contracts and Leases related thereto.

## I.      PROPOSED BID AND SALE PROCEDURES
### Summary of Proposed Bidding Procedures

14.      Except as otherwise provided in an Stalking Horse Agreement (as defined below), all of the MMBU Debtors' rights, title and interest in all of the Purchased Assets shall be sold free and clear of any Encumbrances and other interests pursuant to section 363 of the Bankruptcy Code.  The MMBU Debtors propose that any such Encumbrances and other interests shall attach to the amounts payable to the MMBU Debtors' estates resulting from the Sale, net of any transaction fees (the "Sale Proceeds"), in the same order of priority and subject to the rights, claims, defenses, and objections, if any, of all parties with respect thereto, subject to any further order of the Court.

-8-

15.     The MMBU Debtors will not entertain bids for all or substantially all of the Purchased Assets that do not at least meet or exceed cash amount equal the value of the sum of DIP Credit Bid and Release and the Prepetition Credit Bid and Release plus the amount of the Expense Reimbursement, plus $2,000,000.

16.     In order to ensure that the MMBU Debtors receive the maximum value for the Purchased Assets, the Stalking Horse Agreement is subject to higher or better offers, and, as such, the Stalking Horse Agreement will serve as the "stalking-horse" bid for the Assets.

**A.      Initial Requirements for Potential Bidders**

17.     In order to be qualified to receive any confidential information from the MMBU Debtors, to submit a Qualified Bid (as defined below) and to participate in the Auction, a potential bidder (each, a "<u>Potential Bidder</u>") must submit to the MMBU Debtors (i) a confidentiality agreement on terms substantially similar to those provided to the Stalking Horse Purchaser and (ii) evidence demonstrating the Potential Bidder's financial capability to consummate the sale transaction of the Purchased Assets.  Following the submission of these documents, a Potential Bidder will have the opportunity to perform due diligence on the Purchased Assets.  The MMBU Debtors' advisors shall continue to maintain an electronic data room containing reasonable due diligence material.  The due diligence period shall expire on the Bid Deadline (as defined below).

18.     Notwithstanding the foregoing, the MMBU Debtors will limit access to due diligence to those parties it believes, in the exercise of its reasonable judgment, are pursuing the transaction in good faith.

**B.      Provisions Governing Qualified Bids**

19.     Unless otherwise ordered by the Court, in order to participate in the bidding process, a Potential Bidder must, prior to the Bid Deadline (defined below), become a Qualified Bidder by delivering a Qualified Bid (defined below) to the MMBU Debtors.

20.     In order to participate at the Auction, a Potential Purchaser must submit the following documents to the MMBU Debtors so as to be received by the Bid Deadline (as defined below) and meet the following conditions:

(a)      it includes a signed writing that the Potential Bidder's offer is irrevocable until entry of the Sale Order, provided that if such Potential Bidder is selected as the Successful Bidder its offer shall remain irrevocable until the earlier of (i) the closing of the sale to the Successful Bidder, and (ii) the date that is twenty (20) business days after the Sale Hearing;

(b)      it includes a duly authorized and executed copy of an Asset Purchase Agreement, including the purchase price for the Purchased Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, together with copies marked to show any amendments and modifications to the Stalking Horse Agreement ("Marked Agreement") and the proposed orders to approve the sale by the Bankruptcy Court; provided, however, that such Stalking Horse Agreement shall not include any financing or diligence conditions or contain any other conditions to consummation other than those set forth in the Stalking Horse Agreement;

(c)      the Purchase Price is in an amount that is no less than: (1) cash consideration sufficient to repay (x) the DIP Credit Bid and Release and the Prepetition Credit Bid and Release and (y) the Expense Reimbursement, plus (2) $2,000,000 in cash;

(d)      it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the MMBU Debtors), certified check or such other form acceptable to the MMBU Debtors, payable to the order of the MMBU Debtors (or such other party as the MMBU Debtors may determine) in an amount equal to 10% of the Purchase Price; provided, however, that the Stalking Horse Purchaser shall not be required to provide such a deposit;

(e)      it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the MMBU Debtors to make a reasonable

determination as to the Potential Bidder's financial wherewithal and other capabilities to consummate the transaction contemplated by the Stalking Horse Agreement;

(f)     it provides, at a minimum, for the payment or assumption of all the liabilities that would be assumed by the Potential Bidder (other than the obligations under the DIP Financing Agreement, which shall be repaid in cash from the Sale Proceeds) and must identify any and all executory contracts and unexpired leases to be assumed;

(g)     it includes an acknowledgement and representation that the Potential Bidder: (A) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer; (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction (defined below), except as expressly stated in the Stalking Horse Agreement; and (D) is not entitled to any expense reimbursement, break-up fee, or similar type of payment in connection with its bid; provided that, the Stalking Horse Purchaser shall not be required to provide such acknowledgment and representation;

(h)     it contains such other information reasonably requested by the MMBU Debtors (including the identity of the ultimate parent of a Potential Bidder that is a special purposes entity formed for the acquisition of the Purchased Assets); and

(i)     it is received prior to the Bid Deadline (as defined below).

21.     A Potential Bidder that delivers the documents and information described above and that the MMBU Debtors, after consultation with their advisors and the DIP Lenders, believe is on the same or better terms than the bid submitted by the Stalking Horse Purchaser and is likely (based on availability of financing, experience and other considerations) to be able to consummate the sale, will be deemed a "Qualified Bidder" and such bid will be deemed a "Qualified Bid".  As promptly as practicable after a Potential Bidder delivers all of the materials required above, the MMBU Debtors will determine and will notify the Potential Bidder and the Stalking Horse Purchaser if such Potential Bidder is a Qualified Bidder; provided such

notification shall not be given later than two (2) days following the expiration of the Bid Deadline.

22.    Notwithstanding the foregoing, the Stalking Horse Purchaser will be deemed a Qualified Bidder, and the Stalking Horse Agreement will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.

**C.    Bid Deadline**

23.    A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) counsel to the Debtors: DLA Piper LLP (US), 203 N. LaSalle Street, Suite 1900, Chicago, Illinois 60601 (Attn: Richard A. Chesley, Esq. (richard.chesley@dlapiper.com) and Matt Murphy, Esq. (matt.murphy@dlapiper.com); (ii) counsel to the Committee: _____ _____; (iii) the Office of the United States Trustee: US Trustee, 844 King Street, Suite 2207, Lockbox #35, Wilmington, Delaware, 19899-0035 (Fax: 302-573-6497) (Attn: _____, Esq.) (_____._____@usdoj.gov); and (iv) counsel to the Stalking Horse Purchaser: Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017 (Fax: 212-455-2502) (Attn: Sandy Qusba, Esq. and Morris Massel, Esq., so as to be received by the MMBU Debtors not later than December 3, 2013 at 9:00 a.m. (prevailing Eastern Time) (the "Bid Deadline").  Upon receipt by the MMBU Debtors of a bid from a Qualified Bidder, the MMBU Debtors shall immediately provide a copy of such Qualified Bid to the Stalking Horse Purchaser and its counsel.  The Bid Deadline may not be extended without the written consent of the Stalking Horse Purchaser.

**D.    Evaluation of Competing Bids**

24.    A Qualified Bid will be valued based upon several factors including, without limitation, (a) the amount of such bid, (b) the risks and timing associated with consummating

such bid, (c) any proposed revisions to the Stalking Horse Agreement, (d) the ability of the

Potential Bidders to obtain appropriate regulatory approvals, (e) any other factors deemed

relevant by the MMBU Debtors in their reasonable discretion in consultation with the DIP

Lenders, and (f) the assumed liabilities and imposed costs compared to the Stalking Horse

Agreement.  The Stalking Horse Agreement is a Qualified Bid.

**E.      Credit Bidding**

25.      In connection with the Sale of all or any of the Purchased Assets and the

Debtors' motion to obtain post-petition financing (the "<u>DIP Motion</u>"), the MMBU Debtors'

have sought approval of its prepetition and postpetition lenders' right to credit bid some or all of

their claims for their respective collateral (a "<u>Credit Bid</u>").   Accordingly, the MMBU Debtors

seek the Court's allowance of credit bidding in connection with any Sale to the full extent of

Bankruptcy Code section 363(k).

**F.      No Qualified Bids**

26.      If the MMBU Debtors does not receive any Qualified Bids other than the

Stalking Horse Agreement, the MMBU Debtors will not hold an auction and the Stalking Horse

Purchaser will be named the Successful Bidder on the Bid Deadline.

**G.      Auction Process**

27.      If the MMBU Debtors receive one or more Qualified Bids in addition to the

Stalking Horse Agreement, the MMBU Debtors will conduct the Auction of the Purchased

Assets, which shall be transcribed, on December 9, 2013 at 10:00 a.m. (prevailing Eastern

time), at the offices of DLA Piper LLP (US), 1251 Avenue of the Americas, 27th Floor, New

York, NY 10020, or such other location as shall be timely communicated to all entities entitled

to attend the Auction.  The Auction shall run in accordance with the following procedures:

(a)     only the MMBU Debtors, the Committee (if any), the Stalking Horse Purchaser, Qualified Bidders, any creditor of the MMBU Debtors that has provided written notice to the MMBU Debtors' counsel at least five (5) business days in advance of the Auction of his, her, or its intent to attend the Auction, and their respective advisors may attend the Auction;

(b)     only the Stalking Horse Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction;

(c)     each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

(d)     at least one (1) business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the MMBU Debtors whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the date of the selection of the Successful Bidder at the conclusion of the Auction.  At least one (1) business day prior to the Auction, the MMBU Debtors will provide copies of the Qualified Bid or combination of Qualified Bids which the MMBU Debtors believe, in consultation with the DIP Lenders, is the highest or otherwise best offer (the "Starting Bid") to the Stalking Horse Purchaser and all other Qualified Bidders;

(e)     all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction and the actual identity of each Qualified Bidder will be disclosed on the record at the Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person;

(f)     the MMBU Debtors, in consultation with their advisors and with the consent of the lenders party to the DIP Financing Agreement (the "DIP Lenders"), may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction; and

(g)     bidding at the Auction will begin with the Starting Bid and continue in bidding increments (each a "Subsequent Bid") providing a net value to the estate of at least an additional $1,000,000 above the prior bid.  After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will

conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Each Qualified Bidder will only have one opportunity to pass. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Stalking Horse Purchaser), the MMBU Debtors will give effect to the Expense Reimbursement payable to the Stalking Horse Purchaser under the Stalking Horse Agreement as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the MMBU Debtors.

(h)     The Stalking Horse Purchaser shall be entitled to increase the amount of its Credit Bid to the full amount then outstanding and owing under the Credit Agreement and DIP Financing Agreement and the full amount of the Expense Reimbursement. All Subsequent Bids of Qualified Bidders other than the Stalking Horse Purchaser must provide for cash consideration to repay any incremental Credit Bid by the Stalking Horse Purchaser.

## H.    Selection of Successful Bid

28.     Prior to the conclusion of the Auction, the MMBU Debtors, in consultation with their advisors and the DIP Lenders, will review and evaluate each Qualified Bid in accordance with the procedures set forth herein and determine which offer is the highest or otherwise best offer from among the Qualified Bidders (including the Stalking Horse Purchaser) submitted at the Auction (one or more such bids, collectively the "Successful Bid" and the bidder(s) making such bid, collectively, the "Successful Bidder"), and communicate to the Stalking Horse Purchaser and the other Qualified Bidders the identity of the Successful Bidder and the details of the Successful Bid. The determination of the Successful Bid by the MMBU Debtors at the conclusion of the Auction shall be final, subject only to approval by the Bankruptcy Court.

29.     Unless otherwise agreed to by the MMBU Debtors and the Successful Bidder, within two (2) business days after adjournment of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made. Within one

business day following adjournment of the Auction, the MMBU Debtors shall file a notice

identifying the Successful Bidder with the Bankruptcy Court and shall serve such notice by fax,

email or overnight mail to all counterparties whose contracts are to be assumed and assigned.

30.     The MMBU Debtors will sell the Purchased Assets to the Successful Bidder

pursuant to the terms of the Successful Bid upon the approval of such Successful Bid by the

Bankruptcy Court at the Sale Hearing.

**I.      Return of Deposits**

31.     All deposits shall be returned to each bidder not selected by the MMBU Debtors

as the Successful Bidder no later than five (5) business days following the conclusion of the

Auction.

**J.      The Expense Reimbursement**

32.     In recognition of this expenditure of time, energy, and resources, the MMBU

Debtors has agreed that if the Stalking Horse Purchaser is not the Successful Bidder, the

MMBU Debtors will pay the Stalking Horse Purchaser an amount in cash equal to the aggregate

amount of the reasonable fees and expenses incurred by the Stalking Horse Purchaser in

connection with the negotiation, documentation, execution and delivery of the Stalking Horse

Agreement and related agreements and the Stalking Horse Purchaser's participation in the

Auction, including the reasonable fees and expenses of its counsel, financial advisors and other

professionals (the "Expense Reimbursement").   The Expense Reimbursement shall be payable

and paid as provided for pursuant to the terms of the Stalking Horse Agreement.

33.     the MMBU Debtors have further agreed that their obligation to pay the Expense

Reimbursement pursuant to the Stalking Horse Agreement shall survive termination of the

Stalking Horse Agreement and shall, to the extent owed by the MMBU Debtors, constitute an

administrative expense claim under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy

Code and shall not be subordinate to any other administrative expense claim other than

administrative expense claims granted pursuant to an adequate protection order in existence as

of the date hereof.

**K.     Sale Hearing**

34.     The MMBU Debtors will seek entry of an order from the Bankruptcy Court at

the Sale Hearing to begin on or before December 16, 2013, to approve and authorize the sale

transaction to the Successful Bidder on terms and conditions determined in accordance with the

Bid Procedures.

**L.     Closing**

35.     The closing of the sale of the Purchased Assets pursuant to the Successful Bid

shall occur by no later than December 20, 2013.

<u>**Notice of Sale Hearing**</u>

36.     As stated above, the MMBU Debtors request that this Court schedule the Sale

Hearing for December 16, 2013.  The MMBU Debtors propose that any objections to the Sale

be filed by 4:00 p.m. (prevailing Eastern Time) on December 12, 2013.

37.     The MMBU Debtors also request that the Court approve the form of the

Procedures Notice, substantially in the form of <u>Exhibit 4</u> to the Bidding Procedures Order.  The

MMBU Debtors will serve a copy of the Procedures Notice on the following parties:  (a) the US

Trustee, (b) the Committee (if any), (c) any parties requesting notices in these cases pursuant to

Bankruptcy Rule 2002, and (d) all Potential Bidders (collectively with the parties specified in

this paragraph, the "<u>Procedures Notice Parties</u>").

38.     The MMBU Debtors propose to serve the Procedures Notice within two (2)

business days following entry of the Bidding Procedures Order, by first-class mail, postage

prepaid on the Procedures Notice Parties.  The Procedures Notice provide that any party that has

not received a copy of the Motion or the Bidding Procedures Order that wishes to obtain a copy

of the Motion or the Bidding Procedures Order, including all exhibits thereto, may make such a

request in writing to BMC Group, c/o Velti Claims Processing, PO Box 3020, Chanhassen, MN

55317 or by email at www.bmcgroup.com/velti.

39.     The MMBU Debtors submit that the foregoing notices comply fully with

Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of

the Bidding Procedures, Auction and Sale, and Sale Hearing to the MMBU Debtors' creditors

and other parties in interest as well as to those who have expressed an interest or are likely to

express an interest in bidding on the Purchased Assets.  Based on the foregoing, the MMBU

Debtors respectfully request that this Court approve these proposed notice procedures.

### Sale Hearing

40.     At the Sale Hearing, the MMBU Debtors will seek Court approval of the Sale to

the Successful Bidder, free and clear of all Encumbrances and other interests pursuant to section

363 of the Bankruptcy Code, with all such Encumbrances and other to attach to the Sale

Proceeds with the same validity and in the same order of priority as they attached to the

Purchased Assets prior to the Sale, including the assumption by the MMBU Debtors and

assignment to the Successful Bidder of the Assumed Executory Contracts (defined below)

pursuant to section 365 of the Bankruptcy Code.  The MMBU Debtors will submit and present

additional evidence, as necessary, at the Sale Hearing demonstrating that the Sale is fair,

reasonable and in the best interest of the MMBU Debtors' estates and all interested parties.

### Procedures for the Assumption and Assignment of Assigned Contracts and Leases

41.     As noted above, the MMBU Debtors will seek to assume and assign certain

Contracts and Leases to be identified on schedules to the Stalking Horse Agreement other than

those agreements excluded by the Successful Bidder pursuant to such bidder's Asset Purchase Agreement (collectively, the "Assumed Executory Contracts").

42.      At least initially, the Assumed Executory Contracts will be those Contracts and Leases that the MMBU Debtors believe may be assumed and assigned as part of the orderly transfer of the Purchased Assets.  The Successful Bidder may choose to exclude (or to add) certain Contracts or Leases to the list of Assumed Executory Contracts, subject to further notice.

43.      In the interim, the MMBU Debtors will serve the Motion and the Cure Notice, substantially in the form of Exhibit 5 to the Bidding Procedures Order, upon each counterparty to the Assumed Executory Contracts by no later than November 15, 2013.  The Cure Notice will state the date, time and place of the Sale Hearing as well as the date by which any objection to the assumption and assignment of Assumed Executory Contracts must be filed and served.  The Cure Notice also will identify the amounts, if any, that the MMBU Debtors believe are owed to each counterparty to an Assumed Executory Contract in order to cure any defaults that exist under such contract (the "Cure Amounts").  If a Contract or Lease is assumed and assigned pursuant to Court Order, then unless the Assumed Executory Contract counterparty properly files and serves an objection to the Cure Amount contained in the Cure Notice, the Assumed Executory Contract counterparty will receive at the time of the Closing of the sale (or as soon as reasonably practicable thereafter), the Cure Amount as set forth in the Cure Notice, if any, with payment to be made pursuant to the terms of the Successful Bidder's Stalking Horse Agreement.  If an objection is filed by a counterparty to an Assumed Executory Contract, the MMBU Debtors propose that such objection must set forth a specific default in any executory contract or unexpired lease and claim a specific monetary amount that differs from the amount, if any, specified by the MMBU Debtors in the Cure Notice.  To the extent there is a contract to

be assumed pursuant to the Successful Bidder's Stalking Horse Agreement, this Motion

constitutes a separate motion to assume and assign that contract to the Successful Bidder

pursuant to section 365 of the Bankruptcy Code; each such contract will be listed on an exhibit

to the Successful Bidder's Stalking Horse Agreement, and will be given a separate Cure Notice.

44.     If any counterparty objects for any reason to the assumption and assignment of

an Assumed Executory Contract (a "Cure Amount Objection"), the MMBU Debtors propose

that the counterparty must file the objection by no later than (a) 4:00 p.m. (prevailing Eastern

Time) on December 5, 2013 or (b) the date otherwise specified in the Cure Notice (or,

alternatively, the date set forth in the motion to assume such Assumed Executory Contract if

such contract is to be assumed and assigned after the Auction), provided, however, that if the

Successful Bidder is not the Stalking Horse Purchaser, any counterparty may raise at the Sale

Hearing an objection to the assumption and assignment of the Assumed Executory Contract

solely with respect to the Successful Bidder's ability to provide adequate assurance of future

performance under the Assumed Executory Contract.  After receipt of a Cure Amount

Objection, the MMBU Debtors will attempt to reconcile any differences in the Cure Amount.

In the event that the MMBU Debtors and the non-debtor party cannot resolve the Cure Amount

Objection, and the Court does not otherwise make a determination at the Sale Hearing, the

MMBU Debtors may, in their discretion, segregate any disputed Cure Amounts pending the

resolution of any such disputes by the Court or mutual agreement of the parties.

45.     The Successful Bidder shall be responsible for satisfying any requirements

regarding adequate assurance of future performance that may be imposed under section 365(b)

of the Bankruptcy Code in connection with the proposed assignment of any Assumed Executory

Contract, and the failure to provide adequate assurance of future performance to any

counterparty to any Assumed Executory Contract shall not excuse the Successful Bidder from performance of any and all of its obligations pursuant to the Successful Bidder's Stalking Horse Agreement.  The MMBU Debtors propose that the Court make its determinations concerning adequate assurance of future performance under the Assumed Executory Contacts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing.  Cure Amounts disputed by any counterparty will be resolved by the Court at the Sale Hearing or such later date as may be agreed to or ordered by the Court.

46.    Except to the extent otherwise provided in the Successful Bidder's Stalking Horse Agreement, the MMBU Debtors and the MMBU Debtors' estates shall be relieved of all liability accruing or arising after the assumption and assignment of the Assumed Executory Contracts pursuant to section 365(k) of the Bankruptcy Code.

## II.    APPLICABLE AUTHORITY

### A.    The Sale of the Purchased Assets is Authorized by Section 363 as a Sound Exercise of the MMBU Debtors' Business Judgment

47.    In accordance with Bankruptcy Rule 6004, sales of property rights outside the ordinary course of business may be by private sale or public auction.  The MMBU Debtors have determined that the Sale of the Purchased Assets by public auction will enable it to obtain the highest and best offer for these assets (thereby maximizing the value of estates) and is in the best interests of the MMBU Debtors' creditors.  In particular, the Stalking Horse Agreement is the result of comprehensive, arm's length negotiations for the Sale of the Purchased Assets, and the Sale pursuant to the terms of the Stalking Horse Agreement, subject to higher or otherwise better offers at the Auction, will provide a greater recovery for the MMBU Debtors' creditors than would be provided by any other existing alternative.

48.     Section 363 of the Bankruptcy Code provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, a sale of a debtor's assets should be authorized if a sound business purpose exists for doing so.  See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 289, 295 (3d Cir. 1996); In re Abbotts Dairies of Pennsylvania, Inc., 788 P.2d 143 (2d Cir. 1986); In re Titusville Country Club, 128 BR. 396 (W.D. Pa. 1991); In re Delaware & Hudson Ry. Co., 124 BR. 169, 176 D. Del. 1991); see also Official Committee of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

49.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  See, e.g., In re Food Barn Stores, Inc., 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); Integrated Resources, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the. . . [trustee's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 BR. 124, 130 (Bankr. N.D. Ga. 1988)).  As long as the sale appears to enhance a debtor's estate, court approval of a trustee's decision to sell should only be withheld if the trustee's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.  GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd., 331

B.R. 251, 255 (N.D. Tex. 2005); In re Lajijani, 325 B.R. 282, 289 (9th Cir. B.A.P. 2005); In re

WPRV-TV, Inc., 143 B.R. 315, 319 (D. P.R. 1991) ("The trustee has ample discretion to

administer the estate, including authority to conduct public or private sales of estate property.

Courts have much discretion on whether to approve proposed sales, but the trustee's business

judgment is subject to great judicial deference.").

50.     Applying section 363, the proposed Sale of the Purchased Assets should be

approved.  As set forth above, the MMBU Debtors have determined that the best method of

maximizing the recovery of the MMBU Debtors' creditors would be through the Sale of the

Purchased Assets.  The fairness and reasonableness of the consideration to be paid by the

purchaser(s) will be demonstrated by adequate "market exposure" and an open and fair auction

process — the best means for establishing whether a fair and reasonable price is being paid.  In

order to ensure a fair auction process, the MMBU Debtors have and will continue to solicit

interest from numerous potential purchasers.

51.     Further, the MMBU Debtors believe that the value the MMBU Debtors'

estates—and, thus, the MMBU Debtors' creditors—will receive for the Sale of the Purchased

Assets as a going concern exceeds any value the MMBU Debtors' estates could get for the

Purchased Assets if the MMBU Debtors were required to liquidate these assets piecemeal.  The

MMBU Debtors also believe that the value of the consideration likely to be received for the

Purchased Assets under an Stalking Horse Agreement is fair and reasonable.  As further

assurance of value, however, bids will be tested through the Auction consistent with the

requirements of the Bankruptcy Code, the Bankruptcy Rules, and pursuant to the Bidding

Procedures approved by the Court.  Consequently, the fairness and reasonableness of the

consideration to be paid by the Successful Bidder ultimately will be demonstrated by adequate

"market exposure" and an open and fair auction process — the best means, under the circumstances, for establishing whether a fair and reasonable price is being paid.

52.     The MMBU Debtors and their investment banker believe that the timeline for the marketing and sale of the Purchased Assets is adequate, especially considering the limited liquidity and extensive marketing efforts that have already occurred with respect to the business. The contemplated timeline thus balances the need to conduct any additional marketing and maintain continuity in the operation of the business for vendors, customers and employees.  The MMBU Debtors' investment banker has been in contact with potential interested parties and, upon the execution of an appropriate confidentiality agreement, has provided them access to a data room that has been assembled.   There is a limited universe of potential acquirers of the Purchased Assets, and, the MMBU Debtors and their investment banker have been active in discussions with most, if not all, of these potential purchasers.

**B.     The Bidding Procedures Are Appropriate and Will Maximize the Value Received for the Purchased Assets.**

53.     As noted above, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales.  See, e.g., In re Fin'l News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

54.     Procedures to dispose of assets, similar to the proposed Bidding Procedures, have been approved in other large, complex bankruptcy cases.  See, e.g., In re Orchard Supply

Hardware Stores Corporation, Case No. 13-11565 (CSS) (Bankr. D. Del. Jul. 8, 2013); In re

Trident Microsystems, Inc., Case No. 12-10069 (CSS) (Bankr. D. Del. Mar. 23, 2012); In re

Conex Holdings LLC, Case No. 11-10501 (CSS) (Bankr. D. Del. Sept. 14, 2011); In re Barnes

Bay Development Ltd., Case No. 11-10792 (PJW) (Bankr. D. Del. May 19, 2011); In re East

West Resort Development V, L.P., L.L.L.P., Case No. 10-10452 (BLS) (Bankr. D. Del. March

31, 2010); In re Dana Corp., Case No. 06-10354 (Bankr. S.D.N.Y. Oct. 19, 2006); In re Delphi

Corp., Case No. 05-44481 (Bankr. S.D.N.Y. June 22, 2006); In re Oxford Automotive, Inc.,

Case No. 04-74377 (Bankr. E.D. Mich. Jan. 24, 2005); see also In re Calpine Corp., Case No.

05-60200 (Bankr. S.D.N.Y. Dec. 6, 2006).

55.     The MMBU Debtors believe that the Bidding Procedures will establish the

parameters under which the value of the Purchased Assets may be tested at an auction and

through the ensuing Sale Hearing.  Such procedures will increase the likelihood that the MMBU

Debtors' creditors will receive the greatest possible consideration for their assets because they

will ensure a competitive and fair bidding process.  They also allow the MMBU Debtors to

undertake an auction in as expeditious and efficient a manner as possible, which the MMBU

Debtors believe is essential to maximizing the value of the MMBU Debtors' estates for their

creditors.

56.     The MMBU Debtors also believe that the proposed Bidding Procedures will

promote active bidding from seriously interested parties and will dispel any doubt as to the best

and highest offer reasonably available for the MMBU Debtors' assets.  In particular, the

proposed Bidding Procedures will allow the MMBU Debtors to conduct an auction in a

controlled, fair and open fashion that will encourage participation by financially capable bidders

who demonstrate the ability to close a transaction.

57.    In sum, the MMBU Debtors believe that the Bidding Procedures will encourage bidding for the Purchased Assets and are consistent with the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  Accordingly, the proposed Bidding Procedures are reasonable, appropriate and within the MMBU Debtors' sound business judgment.

## C.    Credit Bidding Should be Authorized

58.    A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that in a sale under section 363 of the Bankruptcy Code, unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."  11 U.S.C. § 363(k).  Even if a secured creditor is undersecured, as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the total face value of its claim on its collateralized assets and does not limit the credit bid to the claim's economic value.  See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.), 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled among district and bankruptcy courts that creditors can bid the full face value of their secured claims under § 363(k)").

59.    Pursuant to the Bidding Procedures and the prospective interim order approving the DIP Motion, the MMBU Debtors' secured lenders are entitled to credit bid some or all of their claims for their respective collateral pursuant to section 363(k) of the Bankruptcy Code. Because the Secured Lenders hold claims that are secured by certain of the Purchased Assets, such lenders should be allowed to credit bid the face value of their secured claims in order to purchase such assets.

**D.    The Sale of the Purchased Assets Free and Clear of Encumbrances and Other Interests is Authorized by Sections 363(f)**

60.    The MMBU Debtors further submit that it is appropriate to sell the Purchased Assets free and clear of Encumbrances pursuant to section 363(f) of the Bankruptcy Code, with any such liens attaching to the Sale Proceeds of the Purchased Assets to the extent applicable. Section 363(f) of the Bankruptcy Code authorizes a trustee to sell assets free and clear of Encumbrances if:

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interests;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f).

61.    This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

62.    Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Purchased Assets "free and clear" of liens and interests.  In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the

disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

63.     The MMBU Debtors believe that the requirements of section 363(f) are satisfied with respect to the transfer of the Purchased Assets pursuant to the Stalking Horse Agreement. In particular, the MMBU Debtors believe that section 363(f)(2) will be met in connection with the transactions proposed under the Stalking Horse Agreement because each of the parties holding liens on the Purchased Assets will consent or, absent any objection to this Motion, will be deemed to have consented to the Sale.  Any lienholder also will be adequately protected by having their liens, if any, in each instance against the MMBU Debtors or their estates, attach to the Sale Proceeds ultimately attributable to the Purchased Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses the MMBU Debtors may possess with respect thereto.  Accordingly, section 363(f) authorizes the transfer and conveyance of the MMBU Debtors' assets free and clear of any Encumbrances.

64.     Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code.  Folger Adam Security v. DeMatteis/MacGregor JV, 209 F.3d 252, 257 (3d Cir. 2000).  In the case of In re Trans World Airlines, Inc., 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest."  The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'"  Id. at 289 (citing 3 Collier on Bankruptcy 15th Ed. Rev., ¶ 363.06[1] (L. King,

15th rev. ed. 1988)).  As determined by the Fourth Circuit in <u>In re Leckie Smokeless Coal Co.</u>,

99 F.3d 573, 581-582 (4th Cir. 1996), a case cited with approval and extensively by the Third

Circuit in <u>Folger</u>, <u>supra</u>, the scope of section 363(f) is not limited to in rem interests.  Thus, the

Third Circuit in <u>Folger</u> stated that <u>Leckie</u> held that the debtors "could sell their assets under

§ 363(f) free and clear of successor liability that otherwise would have arisen under federal

statute." <u>Folger</u>, 209 F.3d at 258.

   65. Courts have consistently held that a buyer of a debtors' assets pursuant to a

section 363 sale takes such assets free from successor liability resulting from pre-existing

claims.  <u>See</u> <u>The Ninth Avenue Remedial Group v. Allis-Chalmers Corp.</u>, 195 B.R. 716, 732

(Bankr. N.D. Ind. 1996) (stating that a bankruptcy court may have the power to sell assets free

and clear of any interest that could be brought against the bankruptcy estate during the

bankruptcy); <u>MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.)</u>, 837

F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale

free and clear under section 363(f) of the Bankruptcy Code); <u>In re New England Fish Co.</u>, 19

B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included

free and clear of Title VII employment discrimination and civil rights claims of debtor's

employees); <u>In re Hoffman</u>, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license

free and clear of any interest permissible even though the estate had unpaid taxes); <u>American</u>

<u>Living Systems v. Bonapfel (In re All Am. Of Ashburn, Inc.)</u>, 56 B.R. 186, 190 (Bankr. N.D.

Ga. 1986) (product liability claims based on successor doctrine precluded  after sale of assets

free and clear); <u>WBO Partnership v. Virginia Dept. of Medical Assistance Servs. (In re WBO</u>

<u>Partnership)</u>, 189 B.R. 97, 104-05 (Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right

to recapture depreciation is an "interest" as used in section 363(f)).[5]  The purpose of an order

purporting to authorize the transfer of assets free and clear of all "interests" would be frustrated

if claimants could thereafter use the transfer as a basis to assert claims against the purchaser

arising from the debtors' pre-sale conduct.  Under section 363(f) of the Bankruptcy Code, the

purchaser is entitled to know that the debtors' assets are not infected with latent claims that will

be asserted against the purchaser after the proposed transaction is completed.  Accordingly,

consistent with the above-cited case law, the order approving the Sale should state that the

Successful Bidder is not liable as a successor under any theory of successor liability, for claims

that encumber or relate to the Purchased Assets.

**E.      The Proposed Notice of Bidding Procedures and Auction Is Appropriate**

66.      The MMBU Debtors believe that they will obtain the maximum recovery for

creditors of the MMBU Debtors' estates if the Purchased Assets of the MMBU Debtors are sold

through a well-advertised sale and auction.  The MMBU Debtors have already taken significant

steps to identify potential purchasers.

67.      Under Bankruptcy Rules 2002(a) and (c), the MMBU Debtors are required to

notify creditors of the proposed sale of the MMBU Debtors' assets, including a disclosure of the

time and place of an auction, the terms and conditions of a sale, and the deadline for filing any

objections.  The MMBU Debtors submit that the notice procedures herein comply fully with

Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of

the sale by auction to the MMBU Debtors' creditors and other interested parties, as well as to

---

5        Some courts, concluding that section 363(f) of the Bankruptcy Code does not empower them to convey
         assets free and clear of claims, have nevertheless found that section 105(a) of the Bankruptcy Code
         provides such authority.  See, e.g., Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White
         Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific
         authority to sell assets free and clear of claims poses no impediment to such a sale, as such authority is
         implicit in the court's equitable powers when necessary to carry out the provisions of title 11).

those parties who have expressed an interest, or may express an interest, in bidding on the

Purchased Assets.  The proposed time frame between the filing of this Motion, the

commencement of the bidding process and the Auction should provide interested purchasers

ample time to participate in the Auction.

**F.      The Expense ReimbursementIs Appropriate Under the Circumstances**

68.      As noted above, the Stalking Horse Purchaser proceeded in reliance on promises

by the MMBU Debtors to seek the Expense Reimbursement and in reasonable expectation that

this Court would enter an order providing such relief.  The MMBU Debtors submit that the

Expense Reimbursement is a normal and oftentimes necessary component of sales outside the

ordinary course of business under section 363 of the Bankruptcy Code.  In particular, an

expense reimbursement encourages a potential purchaser to invest the requisite time, money and

effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and

uncertainties of the chapter 11 process.  See, e.g., In re Comdisco, Inc., Case No. 01-24795

(RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, inter alia, an actual and

necessary cost and expense of preserving the debtors' estates, of substantial benefit to the

MMBU Debtors' estates and a necessary inducement for, and a condition to, the proposed

purchaser's entry into the purchase agreement); Integrated Resources, 147 B.R. at 660 (noting

that fees may be legitimately necessary to convince a "white knight" to offer an initial bid by

providing some form of compensation for the expenses such bidder incurs and the risks such

bidder faces by having its offer held open, subject to higher and better offers); In re Hupp

Indus., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders

would be reluctant to make an initial bid for fear that their first bid will be shopped around for a

higher bid from another bidder who would capitalize on the initial bidder's. . . due diligence");

In re Marrose Corp., 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "agreements to

provide reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"); In re 995 Fifth Ave. Assocs., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding that bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citations omitted).

69.    Moreover, expense reimbursements, similar to the Expense Reimbursement sought to be approved by this Motion, have been approved in other chapter 11 cases in this Court. See, e.g., re Nortel Networks Inc., Case No. 09-10138 (KG) (Bankr. D. Del. Feb. 27, 2009) (approving up to $400,000 in expense reimbursements in connection with $17.65 million sale or 2.3%); In re Tallygenicom, L.P., Case No. 09-10266 (CSS) (Bankr. D. Del. Feb. 19, 2009) (approving $750,000 expense reimbursement in connection with $36.6275 million sale, or 2.0%); In re Fluid Routing Solutions Intermediate Holding Corp., Case No. 09-10384 (CSS) (Bankr. D. Del. Feb. 19, 2009) (approving expense reimbursement of $750,000 in connection with an $11 million sale, or 6.8%);

70.    A proposed bidding incentive, such as the Expense Reimbursement, should be approved when it is in the best interests of the estate. In re S.N.A. Nut Co., 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); see also In re America West Airlines, Inc., 166 B.R. 908 (Bankr. D. Ariz. 1994); In re Hupp Indus., Inc., 140 B.R. 191 (Bankr. N.D. Ohio 1992). Typically, this requires that the bidding incentive provide some benefit to the Debtors' estates. Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 535 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context).

71.     In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy), the Third Circuit found that whether expenses could be paid to Calpine Corp. ("Calpine") as a "stalking horse" depended on whether such fees were necessary to preserve the value of the estate. O'Brien Envtl. Energy, 181 F.3d at 536.  The court determined that Calpine's right to expenses depended on whether it provided a benefit to the MMBU Debtors' estate by promoting competitive bidding or researching the value of the assets at issue to increase the likelihood that the selling price reflected the true value of the company. Id. at 537.  The MMBU Debtors believe that approval of the Expense Reimbursement will create such a competitive bidding process.

72.     First, the MMBU Debtors believe that the proposed Expense Reimbursement is fair and reasonably compensates the Stalking Horse Purchaser for taking actions that will benefit the MMBU Debtors' estates.  The Expense Reimbursement compensates the Stalking Horse Purchaser for diligence and professional fees incurred in negotiating the terms of the Stalking Horse Agreement on an expedited timeline.

73.     Second, the proposed Expense Reimbursement is the result of an arm's-length negotiated agreement between the MMBU Debtors and the Stalking Horse Purchaser.  There is no evidence or reason to believe that the relationship between the MMBU Debtors and the Stalking Horse Purchaser has been tainted by self-dealing or manipulation.

74.     Third, the MMBU Debtors do not believe that the Expense Reimbursement will have a chilling effect on the sale process.  Rather, the Stalking Horse Purchaser has increased the likelihood that the best possible price for the Purchased Assets will be received, by permitting other qualified bidders to rely on the diligence performed by the Stalking Horse

Purchaser, and moreover, by allowing qualified bidders to utilize the Stalking Horse Agreement

as a platform for negotiations and modifications in the context of a competitive bidding process.

75.    Finally, the Expense Reimbursement will be paid only if, among other things, the

MMBU Debtors enter into a transaction with a bidder other than the Stalking Horse Purchaser.

Accordingly, the Expense Reimbursement will not be paid unless a higher and better offer is

achieved and consummated.

76.    In sum, the Expense Reimbursement is reasonable under the circumstances and

will enable the MMBU Debtors to maximize the value for the Purchased Assets while limiting

any chilling effect in the sale process.  The Expense Reimbursement not only compensates the

MMBU Debtors for the risk that they assume in foregoing a known, willing and able purchaser

for a new potential acquirer, but also ensure that there is an increase in the net proceeds received

by their estates, after deducting the Expense Reimbursement to be paid to the Stalking Horse

Purchaser in the event of a prevailing overbid.

**G.    Assumption and Assignment of Certain Executory Contracts and Unexpired Leases**

77.    Section 365(a) of the Bankruptcy Code provides that, subject to the court's

approval, a trustee "may assume or reject any executory contracts or unexpired leases of the

debtor."  11 U.S.C. § 365(a).  Upon finding that a trustee has exercised its sound business

judgment in determining to assume an executory contract or unexpired lease, courts will

approve the assumption under section 365(a) of the Bankruptcy Code.  See Nostas Assocs. v.

Costich (In re Klein Sleep Prods., Inc.), 78 F.3d 18, 25 (2d Cir. 1996); Orion Pictures Corp. v.

Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).

78.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a trustee may assign an

executory contract or unexpired lease of nonresidential real property if:

(A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

79.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

80.     Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

81.     The MMBU Debtors and the Successful Bidder will present evidence at the Sale Hearing to prove the financial credibility, willingness and ability of the Successful Bidder to perform under the Contracts or Leases.  The Court and other interested parties therefore will have the opportunity to evaluate the ability of any Successful Bidder to provide adequate

assurance of future performance under the Contracts or Leases, as required by section 365(b)(1)(C) of the Bankruptcy Code.

82.      In addition, the Cure Procedures are appropriate and consistent with section 365 of the Bankruptcy Code.  To the extent that any defaults exist under any Assumed Executory Contracts, any such defaults will be cured pursuant to the Successful Bidder's Stalking Horse Agreement.  Any provision in the Assumed Executory Contracts that would restrict, condition, or prohibit an assignment of such contracts will be deemed unenforceable pursuant to section 365(f)(1) of the Bankruptcy Code.

83.      Accordingly, the MMBU Debtors submit that the Cure Procedures for effectuating the assumption and assignment of the Assumed Executory Contracts as set forth herein are appropriate and should be approved.

**H.    The Successful Bidder should be Afforded All Protections Under Section 363(m) as A Good Faith Purchaser**

84.      Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor's estate notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'"  In re Chateaugay Corp., 1993 U.S. Dist. Lexis 6130, *9 (S.D.N.Y. 1993) (quoting In re Abbotts Dairies of Penn., Inc., 788 F.2d 143, 147 (3d Cir. 1986)); see also Allstate Ins. Co. v. Hughes, 174 BR. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . .

provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

85.    The selection of the Successful Bidder will be the product of arm's-length, good faith negotiations in an anticipated competitive purchasing process.  The MMBU Debtors intend to request at the Sale Hearing a finding that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

**I.    Relief from the Fourteen Day Waiting Period Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

86.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The MMBU Debtors request that the Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

87.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen (14) day stay period, Collier suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to

close immediately "where there has been no objection to the procedure."  <u>Collier on Bankruptcy</u>

P 6004.11 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  Furthermore, <u>Collier</u> provides

that if an objection is filed and overruled, and the objecting party informs the court of its intent

to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.

<u>Id</u>.

88.    The MMBU Debtors hereby request that the Court waive the fourteen-day stay

period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the

Sale is filed, reduce the stay period to the minimum amount of time needed by the objecting

party to file its appeal.

<b><u>Notice</u></b>

89.    Notice of this Motion shall be provided to: (a) the Office of the United States

Trustee for the District of Delaware; (b) the Debtors' twenty largest unsecured creditors on a

consolidated basis; (c) counsel to HSBC; (d) counsel to GSO; (e) counsel to the Stalking Horse

Purchaser, (f) the United States Attorney's Office for the District of Delaware; (g) the Internal

Revenue Service; (h) the Securities and Exchange Commission; and (i) those parties requesting

notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the

MMBU Debtors respectfully submit that no further notice of this Motion is required.

<i>[remainder of page intentionally left blank]</i>

WHEREFORE, the MMBU Debtors respectfully requests that the Court enter orders

substantially in the form attached hereto as <u>Exhibit B</u> and <u>Exhibit C:</u> (a) granting the relief

requested herein and (b) granting to the MMBU Debtors such other and further relief as the

Court may deem proper.

Dated:  November 4, 2013
        Wilmington, Delaware

Respectfully submitted,

 /s/ Stuart M. Brown
Stuart M. Brown (DE 4050)
DLA PIPER LLP (US)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341
Email:    stuart.brown@dlapiper.com

           -and-

Richard A. Chesley (IL 6240877)
Matthew M. Murphy (IL 6257958)
Chun I. Jang (DE 4790)
DLA PIPER LLP (US)
203 N. LaSalle Street, Suite 1900
Chicago, Illinois 60601
Telephone:  (312) 368-4000
Facsimile:  (312) 236-7516
Email:    richard.chesley@dlapiper.com
          matt.murphy@dlapiper.com
          chun.jang@dlapiper.com

PROPOSED ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION